**UNITED STATES SHOE CORPORATION, Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–Appellant.**

**No. 96–1210.**

United States Court of Appeals,
Federal Circuit.

June 3, 1997.

fice of the General Counsel, Army Corps of Engineers, Washington, DC.

Melvin S. Schwechter, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Washington, DC, for amici curiae Aluminum Company of America, et al. With him on the brief were John C. Cleary and Julie A. Coletti.

Thomas J. Kovarcik, of Irving A. Mandel, Counselor At Law, New York City, for amicus curiae Allied Textile Sales Company. With him on the brief were Irving A. Mandel, Aventura, FL, Steven R. Sosnov, Norristown, PA, and Jeffrey H. Pfeffer, Plainview, NY.

Robert E. Burke, Barnes, Richardson & Colburn, Chicago, Illinois, for amicus curiae Amoco Chemical Company. With him on the brief were Christopher E. Pey and Cindy H. Chan. Of counsel was Lawrence M. Friedman.

John M. Peterson, Neville, Peterson & Williams, New York City, for amici curiae Aris–Isotoner, Inc., et al. Of counsel on the brief were George W. Thompson, James A. Marino, and Arthur K. Purcell.

Mark S. Zolno, Katten, Muchin & Zavis, Chicago, Illinois, for amici curiae Baxter Healthcare Corporation, et al. With him on the brief were Michael E. Roll and Gregory W. Bowman.

William D. Outman, II, Baker & McKenzie, Washington, DC, for amici curiae Brown–Forman Corp., et al. With him on the brief were Kevin M. O'Brien, Lynn S. Baker, and Teresa A. Gleason.

Barry E. Cohen, Crowell & Moring, L.L.P., Washington, DC, for amicus curiae E.I. du Pont de Nemours & Co.

Patrick D. Gill, Rode & Qualey, New York City, for amici curiae General Chemical Corporation, et al. With him on the brief were John S. Rode, Michael S. O'Rourke, and R. Brian Burke.

Steven P. Florsheim, Grunfeld, Desiderio, Lebowitz & Silverman LLP, New York City, for amici curiae Mondial International Corp., et al. With him on the brief were Robert B. Silverman and Erik D. Smithweiss.

Frederic L. Wood, Donelan, Cleary, Wood & Maser, P.C., Washington, DC, for amicus curiae The National Industrial Transporta-

Brian S. Goldstein, Siegel, Mandell & Davidson, P.C., New York City, argued for plaintiff-appellee. With him on the brief were Steven S. Weiser, Laurence M. Friedman, Paul A. Horowitz, and Gregory S. McCue.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General, Jeanne E. Davidson, Assistant Director, and Todd M. Hughes, Attorney. Of counsel on the brief were Richard McManus, Office of the Chief Counsel, United States Customs Service, and Martin R. Cohen, Of-

tion League. With him on the brief were Nicholas J. DiMichael, and Antoine P. Cobb.

Munford Page Hall, II, Dorsey & Whitney LLP, Washington, DC, for amicus curiae New Holland North America, Inc. With him on the brief were John B. Rehm, Robert W. Bras, and Karen A. Zughaib.

Peter Buck Feller, McKenna & Cuneo, L.L.P., Washington, DC, for amicus curiae Swisher International, Inc. With him on the brief were Lawrence J. Bogard, Joseph F. Dennin, Michael K. Tomenga, and Brian J. O'Shea.

Steven H. Becker, Coudert Brothers, New York City, for amici curiae Texaco Refining and Marketing Inc., et al. With him on the brief were Charles H. Critchlow and Claire R. Kelly.

Before MAYER, MICHEL, RADER, and BRYSON, Circuit Judges, and SMITH, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge MICHEL. Dissenting opinion filed by Circuit Judge MAYER.

MICHEL, Circuit Judge.

The United States ("the government") appeals from the December 4, 1995 decision of the United States Court of International Trade granting summary judgment to United States Shoe Corporation ("US Shoe") and holding that the court possessed jurisdiction over this case pursuant to 28 U.S.C. § 1581(i), not 28 U.S.C. § 1581(a), that the Harbor Maintenance Tax ("HMT") violates the United States Constitution and is therefore void as applied to exports. *See United States Shoe Corp. v. United States,* 907 F.Supp. 408 (Ct. Int'l Trade 1995). The case was submitted for our decision after oral argument by the parties before a five-judge panel on February 7, 1997, following briefing not only by the parties but also by numerous amici. The Court of International Trade correctly exercised jurisdiction under 28 U.S.C. § 1581(i) and correctly concluded that the HMT violates the Export Clause, U.S. Const., Art. 1, § 9, cl. 5, because it is a tax on exports rather than a user fee. The HMT, as applied to exports, is not a user fee but rather a tax because it is paid by the exporter, not the direct user of the harbor, and is

calculated solely based on the value of the cargo loaded for export and bears no reasonable relationship to the cost of the use of the port facilities maintained by the government and therefore cannot be a fair approximation of use. We therefore affirm the judgment invalidating the HMT as applied to exports and ordering a refund to U.S. Shoe.

## BACKGROUND

The HMT was imposed by Congress as part of the Comprehensive Water Resources Development Act of 1986 ("the Act"), Pub.L. No. 96-622, 100 Stat. 4082 (codified at 26 U.S.C. § 4461). The Act also established the Harbor Maintenance Trust Fund ("the Trust Fund") to provide for the operation and maintenance of channels and harbors. The details of the HMT, the Act, and the Trust Fund relevant to this lawsuit are set forth in the trial court's opinion and are not repeated here in detail. *See United States Shoe,* 907 F.Supp. at 411-12.

In short, the Act imposes an *ad valorem* tax of 0.125 percent of the value of the commercial cargo involved in "any port use" of federally maintained navigable waterways. 26 U.S.C. §§ 4461, 4462(a)(2) (1994). The HMT is imposed on both exports and imports. As it specifically applies to exports, the HMT statute provides:

(a) General rule.—There is hereby imposed a tax on any port use.

(b) Amount of tax.—The amount of tax imposed by subsection (a) on any port use shall be an amount equal to 0.125 percent of the value of the commercial cargo involved.

(c) Liability and time of imposition of tax.—

(1) Liability.—The tax imposed by subsection (a) shall be paid by—

. . .

(B) in the case of cargo to be exported from the United States, the exporter . . . .

(2) Time of imposition.—Except as provided by regulations, *the tax imposed by subsection (a) shall be imposed*—

(A) *in the case of cargo to be exported from the United States, at the time of loading . . . .*

26 U.S.C. § 4461 (1994) (emphasis added). The term "port use" is defined as "the loading of commercial cargo on, or ... the unloading of commercial cargo from, a commercial vessel at a port." 26 U.S.C. § 4462(a)(1) (1994). The term "port" is defined as "any channel or harbor (or component thereof) in the United States, which ... (i) is not an inland waterway, and (ii) is open to public navigation." 26 U.S.C. § 4462(a)(2)(A) (1994). The term "commercial cargo" is defined as "any cargo transported on a commercial vessel, including passengers transported for compensation or hire," but does not include "bunker fuel, ship's stores, sea stores, or the legitimate equipment necessary to the operation of a vessel, or ... fish or other aquatic animal life caught and not previously landed on shore." 26 U.S.C. § 4462(a)(3) (1994). Thus, although there are certain exemptions, the tax is generally imposed against all imports, exports, domestic shipments, and passengers. *See* 26 U.S.C. §§ 4461(c)(1), 4462(a)(3)(A) (1994).[1] Money collected pursuant to the Act is transferred by Customs to the Trust Fund for disbursal upon further appropriation by Congress. *See* 26 U.S.C. § 9505(b) (1994). The fees were designed to finance the cost of harbor dredging. *See* S.Rep. No. 99–126 at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6639, 6647. By the end of fiscal year 1994, the total amount of fees collected and deposited in the Trust Fund was over 2.7 billion dollars, of which over 700 million dollars was paid by exporters.

Although the HMT was first enacted in 1986, there were no constitutional challenges until recently. US Shoe paid the HMT on articles exported for the period April 1 through June 30, 1994. US Shoe then brought suit in the Court of International Trade for the refund of these payments on the ground that the HMT, as applied to exports, is unconstitutional. In January 1995, given the large number of pending lawsuits challenging the constitutionality of the HMT[2], the Court of International Trade established a three-judge panel and heard

this case as a test case. *See* 28 U.S.C. § 255 (1994) (authorizing the chief judge of the Court of International Trade to designate a three-judge panel to hear cases raising the constitutionality of any Act of Congress or which have broad or significant implications in the administration or interpretation of customs laws).

The parties filed cross-motions for summary judgment and, on October 25, 1995, the trial court issued its decision granting U.S. Shoe's motion for summary judgment. *United States Shoe*, 907 F.Supp. at 408. The trial court first concluded that the HMT was unconstitutional as applied to exports because it constituted a tax, rather than a user fee, as it did not have regulation as its primary purpose and it did not recoup the costs of services provided to the payor. *Id.* at 413–18. Specifically, the trial court noted that "the Act neither discourages nor regulates use of a harbor; neither does it so intend." *Id.* at 413. The trial court also found that "the primary purpose of the [HMT] is to raise revenue, as Congress has imposed 'a duty under the pretext of fixing a fee.'" *Id.* at 414 (citation omitted). The trial court further determined that jurisdiction was not properly based on 28 U.S.C. § 1581(a), because there was no decision of Customs to protest. *Id.* at 418–21. In part, the trial court relied on the fact that "Customs does not determine the application, policies, or rates of the [HMT], but merely serves to implement its provisions." *Id.* at 420. Rather, the trial court held jurisdiction was properly based on 28 U.S.C. § 1581(i) because Congress directed that the HMT be treated as a customs duty and because customs duties, by their very nature, provide for revenue from imports. *Id.* at 421. The Court of International Trade enjoined the government from assessing and collecting the HMT and ordered the parties to file a proposed judgment.

The government appealed, urging that we hold that jurisdiction over these disputes is

---

**1.** For passengers the tax is calculated based on the charge assessed for transportation. *See* 26 U.S.C. § 4462(a)(5)(B) (1994).

**2.** As of the summer of 1996, there were approximately 2400 complaints pending in the Court of

International Trade, as well as approximately 40 complaints pending before the Court of Federal Claims and one complaint pending in district court. The great majority of these lawsuits have been stayed pending the outcome of this appeal.

only proper pursuant to 28 U.S.C. § 1581(a) and that the HMT is constitutional. We heard this case as a five-judge panel pursuant to Local Rule 47.2, which states that "appeals in cases from the Court of International Trade decided by a three-judge court pursuant to 28 U.S.C. § 255 will ordinarily be referred to a panel of five judges." Fed. Cir. R. 47.2.

## ANALYSIS

We "review the summary judgment in this case 'for correctness as a matter of law, deciding *de novo* the proper interpretation of the governing statute and regulations as well as whether genuine issues of material fact exist.'" *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 767 (Fed.Cir.1993) (quoting *Guess? Inc. v. United States*, 944 F.2d 855, 857 (Fed.Cir.1991)). Here, the parties do not dispute any facts, but only dispute questions of law relating to the proper interpretation of the jurisdictional statutes and the constitutionality of the HMT as applied to exports.

### I.

The parties do not dispute that the Court of International Trade possesses exclusive jurisdiction over this type of matter seeking a refund of HMT pursuant to 28 U.S.C. § 1581, in light of Congress' provision that "[f]or purposes of determining the jurisdiction of any court of the United States or any agency of the United States, the tax imposed by this subchapter shall be treated as if such tax were a customs duty." 26 U.S.C. § 4462(f)(2) (1994). The only dispute is whether subsection (a) or subsection (i) of section 1581 applies. The dispute exists because subsection (a) requires that the exporter first file a protest and limits recovery to amounts protested within 90 days of payment, while subsection (i) states only that the action must be initiated within two years of the date on which the cause of action accrued.

The relevant statutory subsections provide as follows:

(a) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.

. . . . .

(i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subjection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for -

(1) revenue from imports or tonnage;

(2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

(3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section. . . .

28 U.S.C. § 1581 (1994).

### A.

■ Although admitting that it does not fit perfectly, the government argues that subsection 1581(a) nevertheless confers jurisdiction over this dispute. The government argues section 1581(a) is the "established route" for obtaining judicial review of duties, charges, and exactions imposed by Congress. As Congress envisioned that the HMT would be treated like a duty, the government argues jurisdiction under this subsection is the only logical result. The government admits, as it must, that subsection (a) requires that prior to the time an exporter can seek judicial review, Customs must issue a decision, the decision must be protested, and the protest must be denied. *See* 19 U.S.C. §§ 1514 (stating that decisions of the Customs Service are final unless a protest is filed), 1515 (stating that all protests will be reviewed within two years of filing). The government argues that the relevant "decision" is Customs' acceptance of the exporter's payment.

In support, the government points to a generic regulation suggesting that the date of exaction (the date of payment) constitutes a protestable event. *See* 19 C.F.R. § 174.12(e) (1996) ("Protests shall be filed ... within 90 days after ... [t]he date of the decision, involving neither a liquidation nor reliquidation, as to which the protest is made (e.g., the date of an exaction. . . .")). According to the government, this regulation eliminates any confusion regarding the availability, timing or other procedures applicable to a protest and over 1000 HMT protests have been received by Customs pursuant to this regulation.

Relying on legislative history, U.S. Shoe responds that Congress directed that the HMT be treated like a duty so that the Court of International Trade, with its expertise in international trade matters, would have jurisdiction over any disputes and so as to facilitate Customs' collection and processing of the HMT. *See* H. Rep. No. 99–228 at 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6705, 6714–15 ("In order to facilitate administration and collection of the port user charges [i.e., the HMT] by the U.S. Customs Service, ... all administrative and enforcement provisions ... are to apply ... as if such charges were customs duties."). Thus, according to U.S. Shoe, it is not clear that Congress intended for jurisdiction over this type of dispute to fall within a particular subsection of section 1581, and there is no evidence that Congress intended to amend the requirement of 19 U.S.C. § 1514 that there must be a Customs "decision" before filing a protest. US Shoe further argues that acceptance of payment is not a protestable decision and that therefore subsection (a) cannot apply.

We find U.S. Shoe's arguments persuasive. Subsection (a) is not directly applicable because it applies to suits commenced to contest the denial of a protest. Decisions of the Customs Service are final unless a protest is filed. 19 U.S.C. § 1514(a) (1994). Decisions can refer to, for example, "the classification and rate and amount of duties chargeable" or "all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury." *Id.* While the HMT is likely a charge or exaction, we do not believe that the actual payment or receipt of the HMT can be a "decision" of Customs, as Customs has not made any decision—it merely passively collects money in the amount required by the statute. Customs doesn't even notify exporters of the need to pay the HMT; rather, the exporter pays all accumulated fees on a quarterly basis by simply mailing a check or money order to Customs along with appropriate forms. *See* 19 C.F.R. § 24.24(e)(2)(ii) (1996).

Typically, "decisions" of Customs are substantive determinations involving the application of pertinent law and precedent to a set of facts, such as tariff classification and applicable rate of duty. Indeed, prior case law indicates that Customs must engage in some sort of decision-making process in order for there to be a protestable decision. Thus, for example, in *Dart Export Corp. v. United States*, 43 C.C.P.A. 64 (1956), one of our predecessor courts held that Customs' acceptance of estimated duties paid by an importer upon entry did not constitute a final, protestable decision which would deprive the government of the right to liquidate the entry at a later date, because the payment was based entirely on information provided by the importer, rather than after analysis and adjudication by Customs. *Id.* at 69–70, 74. Likewise, here, the HMT is based entirely on the exporter's information and calculation. *See* 19 C.F.R. § 24.24(e)(2)(i) (1996). Specifically, this regulation provides that:

> [W]hen cargo is loaded on a commercial vessel for export at a port within the definition of this section, the exporter of that cargo (the name that appears on the SED or equivalent document authorized under 15 CFR 30.39(b)) is liable for the payment of the port use fee at the time of loading. The fee is based upon the value of the shipment loaded as required to be indicated on the SED or equivalent documentation.

*Id.* Thus, Customs merely passively collects payments calculated by the exporters pursuant to statutes and regulations and performs no active role whatsoever. It performs no analysis; it issues no directives or decisions; it imposes no liabilities.

Similarly, in *Mitsubishi Elec. Am., Inc. v. United States*, 44 F.3d 973 (Fed.Cir.1994), this court held that the Court of International Trade lacked jurisdiction over Mitsubishi's complaint under section 1581(a) because the Customs Service did not make any antidumping "decisions" as Customs merely followed the Department of Commerce's instructions in assessing and collecting specified duties. *Id.* at 977. The court pointed out that Customs' role was merely ministerial and that Customs did not determine the rate or amount of the antidumping duties. *Id.* Commerce actually conducted the antidumping duty investigation, calculated the antidumping duties, and issued the antidumping order; Customs merely collected the estimated duties. *Id.* at 976. Likewise, here, there was nothing for Customs to decide, because all substantive particulars regarding the imposition and amount of HMT are established by Congress. The amount of the HMT (0.125 percent of the value of the commercial cargo) is set by statute, 26 U.S.C. § 4461, and the exporter performs the calculation, 19 C.F.R. § 24.24. Customs is merely collecting the HMT in the amount and manner specified by Congress. Thus, there is simply no decision that U.S. Shoe could have protested, or should have been required to protest, in order to allow the Court of International Trade to hear this dispute.

*Norfolk & W. Ry. v. United States*, 843 F.Supp. 728 (Ct. Int'l Trade 1994), *aff'd*, 62 F.3d 1395 (Fed.Cir.1995), relied on by the government, is not to the contrary. There, a railroad company brought an action challenging user fees collected on vehicles and vessels entering the United States. *Id.* at 729. The railroad company filed a user fee refund request with the Secretary of the Treasury on the grounds that its railroad barges were not ferries and that, as barges, they were subject to a cap on user fees. *Id.* at 730. The refund request was granted. However, several years later, Customs informed the railroad company that its barges were indeed ferries and not subject to the cap. *Id.* The court concluded that the user fees were charges subject to protest and that jurisdiction fell under 1581(a). *Id.* at 732–33 ("The user fees at issue in this case are clearly 'charges' within the meaning of § 1514(a) and, therefore, are subject to protest under this subsection."). A careful reading of this case, however, makes clear that the user fees were protestable charges because there had been a specific decision by Customs applying statutory definitions that certain vessels were ferries rather than barges, thus subjecting the cargo to user fees. *Id.* at 730, 733. There, Customs was authorized to collect certain user fees on vehicles and vessels entering the United States. *Id.* at 729. The Railway transported railroad cars on barges into the United States from Canada. *Id.* The amount of fees due varied based on whether the barge was considered a ferry or not. The Railway was notified by Customs that it was required to pay a $7.50 user fee for each of the railroad cars, but no fees for its barges because Customs considered the barges to be ferries. *Id.* at 730. The Railway filed a protest of that decision. There is no comparable analysis and decision here. This is not a case where, for example, U.S. Shoe contended its exports fell within one of the HMT exemptions and Customs decided to the contrary.

We therefore hold that because the collection of the HMT does not involve a protestable decision on the part of Customs, the trial court correctly concluded that jurisdiction over this dispute did not arise under 28 U.S.C. § 1581(a). In light of this holding, we need not reach U.S. Shoe's additional arguments that any protest it might have filed would have been futile or manifestly inadequate.

## B.

Given that the Court of International Trade did not possess jurisdiction under 28 U.S.C. § 1581(a), if it possessed jurisdiction over this dispute, as the government concedes that it did, it can only have been pursuant to the default provision, 28 U.S.C. § 1581(i). The government argues subsection 1581(i) cannot apply because that subsection provides for jurisdiction in only those limited circumstances when jurisdiction under any of the other subsections is unavailable or manifestly inadequate. However, this is no bar to jurisdiction here because jurisdiction under the other subsections, spe-

cifically subsection (a)—the only other arguable possibility—is unavailable. The government also argues that, by its own terms, subsection 1581(i) applies only to imports, not to exports.

We do not agree. As U.S. Shoe persuasively argues, the Court of International Trade properly exercised its jurisdiction under 28 U.S.C. § 1581(i). Congress expressly directed that for jurisdictional, administrative and enforcement purposes, the HMT was deemed to be a customs duty. Thus, it is beyond dispute that Congress intended the Court of International Trade to have jurisdiction over disputes regarding the HMT, as the Court of International Trade has exclusive jurisdiction over customs matters. Moreover, there is no argument made by either U.S. Shoe or the government that the Court of International Trade can exercise jurisdiction over this dispute pursuant to any statute other than 28 U.S.C. § 1581. As discussed above, subsection 1581(a) does not apply. The only other credible, and indeed the only other argued, possibility is subsection 1581(i). Admittedly, subsection (i) does not specifically refer to disputes concerning the constitutionality of fees such as the HMT. It does, however, specifically refer to the "administration and enforcement with respect to the matters referred to in" the preceding paragraphs, including any law providing for revenue from imports. This dispute does involve the "administration and enforcement" of a law providing for revenue from imports because the HMT statute, although applied to exports here, does apply equally to imports. Additionally, the mere fact that subsection 1581(i) does not speak precisely to this issue and does not use the word "exports" is not dispositive, as it "was intended to give the Court of International Trade *broad residual authority* over civil actions arising out of federal statutes governing import transactions...." *Conoco, Inc. v. United States Foreign–Trade Zones Bd.*, 18 F.3d 1581, 1588 (Fed.Cir.1994) (emphasis added).

Thus, in light of the fact that the HMT is a law providing for revenue from imports (as well as exports) and the fact that subsection 1581(i) grants broad residual authority concerning import transactions to the Court of International Trade, the trial court properly asserted jurisdiction over this dispute pursuant to 28 U.S.C. § 1581(i). We must therefore consider whether the trial court correctly held that the HMT, as applied to exports, is unconstitutional.[3]

## II.

The United States Constitution provides that:

> No Tax or Duty shall be laid on articles exported from any State.

U.S. Const., Art. I, § 9, cl. 5. The Supreme Court recently analyzed the Export Clause in *United States v. International Bus. Mach.*, —— U.S. ——, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996). There, the Supreme Court held that the Export Clause does not permit "the imposition of a generally applicable, nondiscriminatory federal tax on goods in export transit." *IBM*, —— U.S. at ——, 116 S.Ct. at 1795. In other words, even those taxes that are imposed equally on exports and imports or other articles of commerce are prohibited by the Export Clause. *See Id.* at ——, 116 S.Ct. at 1803. ("The better reading [of the Export Clause], that adopted by our earlier cases, is that the Framers sought to alleviate their concerns by *completely* denying to Congress the power to tax exports at all.") (emphasis added). Thus, if the HMT is a tax on goods in export transit, it is invalid. We address first whether the HMT is a tax and second whether the HMT is imposed on goods in export transit.

## A.

The HMT statute provides:

(a) General rule.—There is hereby imposed a *tax* on any port use.

(b) Amount of *tax*.—The amount of *tax* imposed by subsection (a) on any port use shall be an amount equal to 0.125 percent of the value of the commercial cargo involved.

---

**3.** We need not and do not address the constitutionality of the HMT statute as applied to any-

thing except exports.

(c) Liability and time of imposition of *tax.*—

(1) Liability.—The *tax* imposed by subsection (a) shall be paid by—

. . . .

(B) in the case of cargo to be exported from the United States, the exporter. . . .

(2) Time of imposition.—Except as provided by regulations, the *tax* imposed by subsection (a) shall be imposed—

(A) in the case of cargo to be exported from the United States, at the time of loading. . . .

26 U.S.C. § 4461 (1994) (emphasis added). Thus, this statute, at least as it applies to exports, appears to be a prohibited tax on exports in that the tax is imposed based on the value of the exported goods and accrues at the time the goods are loaded on a ship for export. Although the legislative history refers to the HMT as a user fee, the statute itself repeatedly refers to the HMT as a tax and is codified in the Internal Revenue Code.

■ The government, however, argues that the fact that the HMT is referred to as a tax is not dispositive and that the HMT is actually a user fee, not a tax. The test used to distinguish between taxes and user fees was first articulated in *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972), and more recently applied in *Massachusetts v. United States*, 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978). That test states that user fees are valid as such so long as they: (1) do not discriminate against the constitutionally protected interest (here, exports); (2) are based on a fair approximation of use; and (3) are not excessive in relation to the cost to the government of the conferred benefits. *See Massachusetts*, 435 U.S. at 464, 98 S.Ct. at 1165–66. We need not decide whether the HMT discriminates against exports or is excessive in relation to the cost to the government of the conferred benefits. Instead, we discuss only whether the HMT is based on a fair approximation of use.

US Shoe argues, and the trial court held, that the HMT is not a fair approximation of the cost of the benefits received by exporters because there is no correlation between the amount of HMT an exporter pays and the amount the exporter uses the port. In other words, the amount of the HMT has no relationship to the size or weight of the vessel or the necessary depth of the port required by the vessel. For example, "[l]ow value bulk cargo importers and exporters use port facilities to a much greater extent than high value non-bulk cargo importers and exporters." *U.S. Shoe*, 907 F.Supp. at 415. Yet, even though the bulk cargo exporters generally require a larger vessel and a deeper port, and therefore "use" the port to a greater extent, they pay a lower tax than high value, low bulk cargo exporters. Moreover, a ship that docks but does not load or unload cargo is not required to pay a fee, even though that ship otherwise utilizes the port. Additionally, there is apparently no correlation between the amount of fees collected at a particular port and the expenditure of funds from the Trust Fund to maintain that particular port. Indeed the trial court found that "most large ports paying the majority of the costs receive no more than 30% back in maintenance expenditures." *Id.* Finally, it is not consistent with a true user fee that so many users are exempted, such as those carrying bunker fuel, ship's stores, equipment necessary for the operation of the vessel and fish and other aquatic animal life not previously landed on shore, 26 U.S.C. § 4462(a) (1994), since ships carrying these products use the port facilities to the same extent as ships carrying products subject to the HMT.

The government argues that the HMT is based on a fair approximation of use and, in support, relies on other cases in which similar *ad valorem* user fees have been upheld. The government first relies on *United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989), where the Supreme Court held that a user fee of 1.5% of all awards recovered from the Iran–United States Claims Tribunal was not an unconstitutional taking but a valid user fee. There, Sperry had argued that the fee could not be a user fee because it did not bear any relationship to the cost of the tribunal to the United States or the value of the tribunal to

Sperry. *Id.* at 60, 110 S.Ct. at 393–94. In rejecting this argument, the Court stated that a user fee need not be "precisely calibrated to the use that a party makes of government services" and need only be a "fair approximation." *Id.* The Court also recognized that, where user fees are applied to a large number of parties, some users will be charged more and some less than in a perfect user-fee system. *Id.* at 61, 110 S.Ct. at 394. Here, the government argues that, as in *Sperry,* the fact that the benefits received do not exactly correspond to the amount of the HMT does not render the HMT statute unconstitutional.

We do not find *Sperry* dispositive for two reasons. First, unlike the present case, in *Sperry* the person receiving the award and paying the fee was the direct beneficiary of the process for which they were paying. In other words, parties that had their claims adjudicated by the tribunal or otherwise received the benefit of the tribunal were required to pay the costs of establishing and maintaining the tribunal. Here, on the other hand, as applied to exports, the direct users—the ship owners—do not contribute to the maintenance of the port and it is only indirect users—the export companies—that are required to pay the HMT. Second, the *Sperry* Court, in distinguishing a case holding registration and axle taxes unconstitutional as a violation of the Commerce Clause, stated that the standard applied under the Just Compensation Clause was less strict than that which would be applied in a Commerce Clause analysis where one is concerned about discrimination against interstate commerce. *Id.* at 61 n. 7, 110 S.Ct. at 394 n. 7. To this we would add that, per *IBM,* the Export Clause is still more restrictive. *See IBM,* —— U.S. at ——, 116 S.Ct. at 1799 ("Our decades-long struggle over the meaning of the nontextual negative command of the dormant Commerce Clause does not lead to the conclusion that our interpretation of the Export Clause is equally fluid. At one time, the Court may have thought that the dormant Commerce Clause required a strict ban on state taxation of interstate commerce, but the text did not require that view. The text of the Export Clause, on the other hand, expressly prohibits Congress from laying any tax or duty on exports.") (footnote omitted).

The government also relies on *Alamo Rent–A–Car v. Sarasota–Manatee Airport Auth.,* 906 F.2d 516 (11th Cir.1990), where the Eleventh Circuit concluded that an airport access fee enacted to provide funds to maintain the airport and based on a rental car company's gross business receipts was a valid user fee. Alamo argued the fee was not a fair approximation because it bore no relation to Alamo's use of the airport and instead varied in proportion to the revenue generated by Alamo's customers. *Id.* at 520. Alamo argued that its only use of the airport was to drive on the airport roads to pick up customers and that its fee should be limited to a pro rata road use fee. *Id.* at 519. The court disagreed, reasoning as follows:

> Although imprecise in particular applications, the Authority's decision to measure Alamo's use of the airport facility by the gross receipts generated from Alamo's airport customers is not irrational. The Authority could reasonably conclude that the ten percent fee on average represents Alamo's use of the airport facility. It stands to reason that *in general* the more money Alamo makes from airport passengers, the more trips Alamo has made to the airport.

*Id.* at 520 (emphasis added). Thus, while imprecise, the fee was not unfair or irrational, but was instead a "fair approximation." Again, the payer of the fee in *Alamo* was the direct beneficiary of the use of the airport, unlike here where the exporter is not the direct beneficiary and is not assured harbor maintenance at the harbor where the exporter's goods are loaded. Moreover, in rejecting Alamo's argument that the fee was unreasonable because it was required to pay a greater fee for a person who rented a car for seven days than for a person who only rented a car for one day even though each individual made equal use of the airport, there the court found that the 10% fee was acceptable because it represented, on average, Alamo's use of the airport. *Id.* Here, there is no such finding that the HMT represents, on average, an exporter's use of the port and, as discussed above, the court concluded that the HMT was not based on a fair approximation

**1574**

of use, thereby implicitly finding that the HMT did not represent, on average, an exporter's use of the port.

The government also argues, without providing any support, that by using the words "fair approximation of use" the Supreme Court in *Massachusetts* intended to refer to the *value* of the benefits received, rather than the *costs* of the benefits received. The government then asserts that the HMT is a fair approximation of the value of the benefits received because the profitability of higher value cargo is higher than for lower value cargo. We do not agree. First, the *Massachusetts* case itself suggests that the cost of the benefits, rather than the value, is the appropriate measure in its statements that "Congress believed that four measures, taken together, would fairly reflect some of the *cost* of the benefits" and "the present scheme nevertheless is a fair approximation of the *costs* of the benefits each aircraft receives." 435 U.S. at 468, 98 S.Ct. at 1167 (emphasis added). Second, higher value merchandise does not always correlate to a higher profit margin and the government has failed to present any facts that would suggest that, even on average, this is the case. Thus, exporters of higher value goods do not necessarily receive a greater benefit, even in terms of value, than exporters of lower value goods. Third, the exporters are forced to pay for harbor maintenance across the entire country, even though they receive no benefit from maintained harbors at any port other than the one they actually use. Fourth, the HMT does not pay for services, such as police, fire or rescue units, that provide benefits to the exporters by keeping the harbors safe whether the exporters use those services or not. *See Maine v. Department of Navy,* 973 F.2d 1007, 1014 (1st Cir.1992) (refusing to grant summary judgment that fee used to pay for a hazardous waste spill response team was not based on a fair approximation

of use because, even though the Navy had not yet needed the team, it was available to minimize any future spill at the shipyard).[4] Therefore, even if the value of the benefits received is an accurate measure, we hold that the HMT is not a fair approximation of the value of the benefits received by the exporters.

We therefore hold that the HMT is not based on a fair approximation of use and, as such, is not a permissible user fee. Although the decision to impose the HMT on an *ad valorem* basis may have substantially reduced administrative costs and burdens, it is nevertheless not based on a fair approximation of use. Since the HMT is not a valid user fee, it must be a tax.

**B.**

■ The government also argues the HMT is not levied against exported articles and, therefore, even if it is a tax, it is not unconstitutional. Rather, according to the government, the fee is imposed on the use of federally maintained harbors by shippers,[5] exporters[6] and importers[7] of commercial cargo, regardless of destination, and is even imposed on the transportation of passengers. Thus, according to the government, the HMT is "an ordinary burden of taxation" rather than a tax or duty imposed on "exported articles."

We do not agree. The Constitution prohibits taxation of articles in the course of being exported. *See A.G. Spalding & Bros. v. Edwards,* 262 U.S. 66, 69, 43 S.Ct. 485, 486, 67 L.Ed. 865 (1923) ("The fact that the law under which the tax was imposed was a general law touching all sales of the class, and not aimed specially at exports, would not help the defendant if in this case the tax was 'laid on articles exported from any State,' because that is forbidden in terms by the Constitution."). Thus, while a tax may be

---

**4.** Notably, in this case the appellate court rejected the Navy's argument that the measure of the authorized fee for services is the value to the recipient. *See Maine,* 973 F.2d at 1014.

**5.** Shippers, i.e., the persons or corporations that pay the freight, are responsible for paying the HMT on commercial shipments within the United States. *See* 19 C.F.R. § 24.24(e)(1)(i) (1996).

**6.** Exporters, i.e., the persons or corporations whose name appears on the SED document or the equivalent document, are liable for the HMT on exports. *See* 19 C.F.R. § 24.24(e)(2)(i) (1996).

**7.** Importers are liable for the HMT on imports. *See* 19 C.F.R. § 24.24(e)(3)(i) (1996).

constitutional if imposed on goods during the manufacturing process, even if they are intended for later export, a tax is not constitutional if imposed on those very same goods after they are loaded on a vessel for export or if imposed when delivered to the carrier for export. *See id.* (holding unconstitutional a tax on baseball bats and balls imposed on "[t]he very act that passed the title and that would have incurred the tax had the transaction been domestic, [and that] committed the goods to the carrier that was to take them across the sea, for the purpose of export and with the direction to the foreign port upon the goods."). Here, the HMT is imposed on an *ad valorem* basis at the time the exported goods are loaded on the vessel, rather than at some prior point in time when the goods are not yet bound for export. The exporter, rather than the manufacturer, pays the tax. In the absence of the export act of loading the goods, and in the absence of the exporter's documents required for that act, the HMT would not be owed and no amount could be determined because the HMT is incurred at the time of loading, 26 U.S.C. § 4461(c)(2)(A), and is based on the value of the goods as determined by the standard commercial export documentation, 26 U.S.C. § 4462(a)(5)(A). *See also* 19 C.F.R. § 24.24(e)(2)(i) ("The fee is based upon the value of the shipment loaded as required to be indicated on the SED or equivalent documentation."). Thus, we conclude that the HMT, as applied against U.S. Shoe, is imposed on exports.

### C.

■ The government makes several additional arguments in support of the constitutionality of the HMT. First, the government argues that the Export Clause is distinct from the Commerce Clause and, consequently, Congress may impose a tax or duty pursuant to its authority to regulate commerce, so long as the purpose of the tax or duty is not to raise revenue for the general welfare. *See Armour Packing Co. v. United States,* 209 U.S. 56, 79, 28 S.Ct. 428, 434–35, 52 L.Ed. 681 (1908) ("But it is to be observed that the Constitution provides for a burden only by the way of taxation or duty, and, unless the alleged interference amounts to

such taxation or duty, it does not come within the constitutional prohibition."). Thus, according to the government, the relevant inquiry is whether the HMT was enacted pursuant to Congress' authority to regulate commerce, not whether it imposes a burden on exports. *See New Orleans Steamship Ass'n v. Plaquemines Port, Harbor and Terminal Dist.,* 874 F.2d 1018, 1021–22 (5th Cir.1989) (holding that a port could impose reasonable fees against ships to finance emergency response services). Second, the government argues that the trial court adopted an overly broad interpretation of the Export Clause because it failed to recognize that the sole purpose of the Export Clause was to prevent the northern states from crippling the export-dependent southern states—not to restrict Congress' authority to impose nondiscriminatory fees designed to recoup costs.

■ We do not agree. The Supreme Court recently reaffirmed the breadth of the Export Clause in the face of the argument that its historical purpose justified a narrow construction. *IBM,* —— U.S. at ——, 116 S.Ct. at 1803 ("While the original impetus may have had a narrow focus, the remedial provision that ultimately became the Export Clause does not, and there is substantial evidence from the Debates that proponents of the Clause fully intended the breadth of scope that is evident in the language."). Moreover, the power to regulate commerce cannot completely override the effect of the Export Clause. *See North Am. Co. v. SEC,* 327 U.S. 686, 704–05, 66 S.Ct. 785, 795–96, 90 L.Ed. 945 (1946) ("This is not to say, of course, that Congress is an absolute sovereign. It is limited by express provisions in other parts of the Constitution, such as section 9 of Article 1 and the Bill of Rights."); *see also IBM,* —— U.S. at ——, 116 S.Ct. at 1798 (rejecting government's request to "reinterpret the Export Clause to permit the imposition of generally applicable, nondiscriminatory taxes as [the Court has] under the Commerce Clause...."). It is undeniable that Congress may regulate commerce by means such as encouraging or discouraging certain actions using regulatory charges to achieve compliance. *See South Carolina v.*

1576

*Block,* 717 F.2d 874, 887 (4th Cir.1983) (imposition of a 50–cent deduction on proceeds of all milk sold commercially is constitutional where "[t]he clear language and structure of the [statute] indicates that its primary purpose is regulation" and the "purpose is to reduce overproduction of milk and shift some of the financial burden of the price support system."). Likewise, it is beyond dispute that Congress may raise money to recover the expenses of a regulatory program. *See, e.g., New Orleans,* 874 F.2d at 1021–22 ("[C]ourts have consistently held that ships may be made to pay for services they get.").

■ It is, however, also beyond dispute that Congress cannot merely impose a direct economic burden on merchandise for export in the absence of regulation. *See IBM,* —— U.S. at —— - ——, 116 S.Ct. at 1798–99 (rejecting the government's argument that the Commerce, Import–Export and Export Clauses should be read in harmony to permit the imposition of generally applicable, non-discriminatory taxes on exports). That is the case here. The government has failed to point to any indication that the HMT is intended to regulate commerce. Indeed, it appears that the HMT regulates nothing. It is not designed to reduce the overall use of the ports. *See Block,* 717 F.2d at 887. Rather, the HMT merely increases the cost of exporting by raising money to maintain the harbors in a manner that is not reasonably connected to the exporter's use of the harbors, and is therefore unconstitutional. Additionally, the government has not persuaded us that the HMT is designed to simply recoup the costs of the services, e.g., port maintenance, provided by the government because the sums paid by the exporter have no reasonable relationship to the cost or the value of the services received by the exporters, and the exporters are not even the direct beneficiaries of the services. Moreover, the mere fact that Congress may have attempted to exert its power under the Commerce Clause, as opposed to the Tax Clause, as evidenced by the fact that the HMT is not designed to raise money for the general welfare, is not dispositive. *See Moon v. Freeman,* 379 F.2d 382, 390–91 (9th Cir.1967) (stating that the "test for determining when a monetary imposition nominally imposed un-der the commerce power should be considered an exercise of the power to raise revenue and therefore [be] barred by the export clause" is "to view the objects and purposes of the statute as a whole and if from such examination it is concluded that revenue is the primary purpose and regulation merely incidental, the imposition is a tax and is controlled by the taxing provisions of the Constitution."). The HMT, in fact, does not regulate or facilitate commerce and is, in effect, a tax. Therefore, as to exporters at least, the HMT is not an appropriate use of Congress' power to facilitate and regulate commerce.

*New Orleans* is distinguishable because there the fees were not assessed based on the value of the goods but were based on the benefit of services such as pilotage, towage and wharfage as measured by the size or weight of a vessel and paid by those benefiting from the service. 874 F.2d at 1020 (fees based on the number of days in port, the length of the vessel, and whether the ships load or unload cargo). Thus, the fees were based on the services received during port use. *Clyde Mallory Lines v. Alabama,* 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935), also relied on by the government, is similarly distinguishable. There, the State Docks Commission, a state agency, imposed a fee on all vessels of a certain size that entered the port and vessel operators alleged that the fee violated the constitutional provision prohibiting imposition of duties of tonnage by states. *Id.* at 262–63, 56 S.Ct. at 194–95. The fee was designed to reimburse the agency for the costs of policing the harbor. *Id.* at 264, 56 S.Ct. at 195. There, however, the parties agreed that the fee was reasonable. *Id.* at 263, 56 S.Ct. at 195. Here, the parties have not reached any such agreement, and, as we conclude above, the fee is not reasonable. Moreover, there the vessel operators—the direct beneficiaries of the agency's policing actions—paid the fee. *Id.* Furthermore, all such operators received the benefits for which they paid. *Id.* at 266, 56 S.Ct. at 196 ("It is not any the less a service beneficial to appellant because its vessels have not been given any special assistance. The benefits which flow from the enforcement of regula-

tions, such as the present, to protect and facilitate traffic in a busy harbor inure to all who enter it."). Finally, the statute at question in that case also had a regulatory effect "plainly devised to insure the safety of vessels and to facilitate their use of the harbor." *Id.* at 264, 56 S.Ct. at 195. Here, there is no such effect. The HMT does not ensure vessel safety, but was designed to cover the costs of dredging the harbors. *See* S.Rep. No. 99–126 at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6639, 6647.

Finally, certain of the amici, given leave to file briefs here, argue that, because the HMT is unconstitutional and therefore void *ab initio,* all monies collected since the implementation of the HMT should be refunded. As U.S. Shoe does not seek such recovery, there is no need for us to reach this issue. Similarly, we do not reach the issue of whether the HMT violates the Port Preference Clause because it is not necessary to our disposition of this appeal.

## CONCLUSION

We conclude that the trial court properly exercised jurisdiction pursuant to 28 U.S.C. § 1581(i). Because Customs merely receives the funds from the exporters and transfers the funds to the Trust Fund without exercising any discretion, performing any analysis, calculating any amounts or issuing any decision or order, there was no Customs' "decision" for U.S. Shoe to protest, and jurisdiction therefore could not be proper under 28 U.S.C. § 1581(a). Moreover, because the HMT is a tax, as opposed to a user fee, directly imposed on goods in export transit, we conclude that the HMT statute, as applied to exports, violates the Export Clause and is therefore invalid to the extent it applies to exports. Therefore, the trial court properly (1) granted summary judgment that the HMT statute was unconstitutional, (2) enjoined the government from collecting further HMT on exports, and (3) ordered it to refund the HMT amounts paid by U.S. Shoe for the period assessed in the complaint. Accordingly, the judgment of the Court of International Trade is

*AFFIRMED.*

MAYER, Circuit Judge, dissenting.

Because in my view the Harbor Maintenance Tax (HMT) is a user fee, it does not violate the Export Clause of the Constitution.

Statutes are presumed constitutional. *Fairbank v. United States,* 181 U.S. 283, 285, 21 S.Ct. 648, 649, 45 L.Ed. 862 (1901). We must "not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988). Indeed, courts must strive to avoid constitutional questions. *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979) (courts are required to choose any reasonable construction of a statute that would eliminate the need to confront a contested constitutional issue); *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895) (courts must resort to "every reasonable construction ... in order to save a statute from unconstitutionality"). Thus, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *DeBartolo,* 485 U.S. at 575, 108 S.Ct. at 1397.

In light of these mandates, the question is whether the HMT is a tax or duty within the proscription of the Export Clause or whether it is a permissible user fee. Generally, a tax is enacted to raise revenue "to go to the general support of the government," *see Head Money Cases,* 112 U.S. 580, 596, 5 S.Ct. 247, 252, 28 L.Ed. 798 (1884), while a user fee is designed as a specific charge for the use of government facilities and services, *see Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 621, 101 S.Ct. 2946, 2955, 69 L.Ed.2d 884 (1981). If it is the latter, we avoid the sticky question whether the assessment violates the Export Clause. So, we must construe the HMT as a user fee, if reasonable to do so, unless it is "plainly contrary to the intent of Congress." *DeBartolo,* 485 U.S. at 575, 108 S.Ct. at 1397.

Congress thought it was enacting a user fee. It is true that the statute calls the HMT a tax and that it resides in the Internal Revenue Code. It is equally true, however, that the HMT is levied on "port use." The label is not dispositive; we must dig deeper. *See Head Money Cases,* 112 U.S. at 595–96, 5 S.Ct. at 252–53 ("[T]he act is not void because, within a loose and more extended sense than was used in the Constitution, it is called a tax."); *Pace v. Burgess,* 92 U.S. 372, 375, 23 L.Ed. 657 (1875); *see also Fairbank,* 181 U.S. at 304, 21 S.Ct. at 656–57 (courts analyze things, not names).

"In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *See Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990). The object and policy of the HMT help to reveal its true identity. The Senate Report states: "The taxes and fees in this legislation are not for the purpose of raising revenue. Rather, they are to repay costs related directly to the servicing of commerce. These fees and taxes offset services rendered to vessels. The provision of a new, deeper channel is as much a service rendered to the shipper as pilotage, dockage, or wharfage."[1] S.Rep. No. 99–126, at 7 (1985), *reprinted in* 1986 U.S.C.C.A.N. 6639, 6644. The House Report similarly states that the HMT is "a *charge on use* by a commercial vessel of a harbor or channel ('port') in the United States for the loading or unloading of commercial cargo on or from the vessel." H.R.Rep. No. 99–228, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6705, 6706 (emphasis added). In fact, the legislative history refers repeatedly to the HMT as being based on use. *See, e.g., id.* at 1, *reprinted in* 1986 U.S.C.C.A.N. at 6706 ("Harbor (Port) User Charges"); H.R. Conf. Rep. No. 99–1013, at 228 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6723, 6740 ("Port Use Tax"); S.Rep. No. 99–126, at 2, *reprinted in* 1986 U.S.C.C.A.N. at 6640 ("user taxes"); *id.* at 135, *reprinted in* 1986 U.S.C.C.A.N. at 6705 (additional views of Sen. Lautenberg) ("user fee").

Moreover, the HMT was enacted as part of the Water Resources Development Act of 1986, Pub.L. No. 99–662, 100 Stat. 4082(Act), "comprehensive" legislation that addressed myriad problems in the federal water resources development program. *See* S.Rep. No. 99–126, at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6641. "Historically, the Federal Government ha[d] financed the full cost of designing, constructing, rehabilitating, maintaining, and operating the ... coastal harbors of the United States." *Id.* at 6, *reprinted in* 1986 U.S.C.C.A.N. at 6643–44. Yet, the law did not "impose Federal user fees or charges on the beneficiaries of these expenditures." H.R.Rep. No. 99–228, at 5, *reprinted in* 1986 U.S.C.C.A.N. at 6709. Congress found that traditional harbor maintenance policy would "not meet national needs" because it was "unlikely that the Federal Government [would] finance the construction of such port improvements." S.Rep. No. 99–126, at 8, *reprinted in* 1986 U.S.C.C.A.N. at 6646. As the House Report explains: "[A]dditional Federal investment is needed for operations and maintenance of U.S. channels and harbors (ports) in order to improve and maintain such ports for waterborne commerce. Such additional investment in U.S. ports will facilitate economic development and make the Nation's water transportation system more efficient." H.R.Rep. No. 99–228, at 5, *reprinted in* 1986 U.S.C.C.A.N. at 6709.

Importantly, Congress found that these needs were "clearly *commercial.*" S.Rep. No. 99–126, at 6, *reprinted in* 1986 U.S.C.C.A.N. at 6644 (emphasis added). It decided "that a portion of Federal expenditures needed for port operations and maintenance should be borne by the *direct beneficiaries* of such expenditures," commercial users. H.R.Rep. No. 99–228, at 5, *reprinted in* 1986 U.S.C.C.A.N. at 6709 (emphasis added). Congress targeted commercial users to help shoulder the fiscal burden of operations and maintenance costs for harbors and inland waterways because they are the parties who enjoy their benefits. The government "has an obvious interest in making those who

---

**1.** Charges for harbor services like pilotage, wharfage, and dockage are permissible. *See generally Clyde Mallory Lines v. Alabama,* 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935).

specifically benefit from its services pay the cost." *Massachusetts v. United States,* 435 U.S. 444, 462, 98 S.Ct. 1153, 1165, 55 L.Ed.2d 403 (1978).

One of Congress' primary difficulties, however, was deciding how to craft a user fee to "help defray the costs of maintaining new harbors deeper than 45 feet."[2] S.Rep. No. 99–126, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6647. "In recent years, the Committee considered a variety of proposals involving harbor maintenance. These ranged from diverting a portion of customs revenues for harbor work to port-by-port maintenance fees to more studies. The debate in some cases is between high maintenance harbors and low maintenance harbors; in others it is between large ports and small ports; or between bulk cargo and containerized cargo ports." *Id.* at 9, *reprinted in* 1986 U.S.C.C.A.N. at 6646. In fact, the Senate Subcommittee on Water Resources held twenty-six hearings over three Congresses and more than four years on the Act. *Id.* at 116, *reprinted in* 1986 U.S.C.C.A.N. at 6688. Ultimately, it opted to impose a nationally-uniform fee on the "value of the cargo passing through harbors." *Id.* at 9, *reprinted in* 1986 U.S.C.C.A.N. at 6646; *see also id.* at 111–12, *reprinted in* 1986 U.S.C.C.A.N. at 6684. The House Report explains that "the ad valorem basis of the charges is the only acceptable basis on which to impose such charges. This national, uniform basis minimizes any possible competitive disadvantages among cargo types and U.S. ports which otherwise might result from user charges." H.R.Rep. No. 99–228, at 5–6, *reprinted in* 1986 U.S.C.C.A.N. at 6710.

Critically, Congress mandated that fees collected from the HMT be used only for commercial navigation projects.[3] Monies in the Harbor Maintenance Trust Fund (HMTF) may be used only to pay (1) for the operations and maintenance costs of the United States portion of the St. Lawrence Seaway, and for the eligible operations and maintenance costs "assigned to *commercial* navigation of all harbors and inland harbors within the United States," 33 U.S.C. § 2238(a) (1994) (emphasis added), *referenced in* 26 U.S.C. § 9505(c)(1) (1994); and (2) for all of the expenses of administering the HMT incurred by the Departments of Treasury and Commerce and the U.S. Army Corps of Engineers, up to $5,000,000 per fiscal year, 26 U.S.C. § 9505(c)(3).[4] So, HMT charges, collected from commercial users, may only be expended for harbor operations and maintenance costs incurred on their behalf.

The government has been true to this constraint. In its initial report to Congress on the HMTF's status, the government explained that operations and maintenance costs for commercial navigation were accounted for in the "Corps of Engineers Management Information System." *First Annual Report to Congress on the Status of the Harbor Maintenance Trust Fund for Fiscal Years 1987—1992* at 2, ¶ 6 [hereinafter *First Report* ]. In deciding which expenditures were reimbursable, the government recognized that some projects have both a "commercial navigation" purpose and some other purpose, such as recreation, hydropower, or flood control. *Id.* at 3, ¶ 7. All operations and maintenance expenditures made for single purpose commercial navigation projects were considered subject to reimbursement from the HMTF. *Id.* In contrast, on joint

2. Very few bays and estuaries have natural depths greater than 20 feet. S.Rep. No. 99–126, at 7, *reprinted in* 1986 U.S.C.C.A.N. at 6645. Yet the size of vessels has so increased that harbors forty-five feet deep are now "inadequate for many fully loaded tankers." *Id.* at 8, *reprinted in* 1986 U.S.C.C.A.N. at 6645. Congress found that the constraints of these shallow harbors "add to the costs of importing crude oil and petroleum products," and that "[d]eeper draft harbors would facilitate the export of U.S. coal and, eventually, other bulk commodities, such as grain and ores." *Id.*

3. Interest earned on monies in the Harbor Maintenance Trust Fund (HMTF) also remains in the fund.

4. 26 U.S.C. § 9505(c)(2) permits monies in the fund to be used to pay rebates of tolls or charges levied for use of the St. Lawrence Seaway, as required by 33 U.S.C. § 988a. Section 988a was amended in 1994, however, to waive the collection of tolls or charges on commercial vessels, instead of requiring commercial users to pay the toll or charge and then obtain a rebate. Pub.L. No. 103–331, § 339(a), 108 Stat. 2496.

purpose projects, the government allocated costs to the project's different purposes in proportion to the benefits realized for each purpose, recovering only the commercial navigation costs. *Id.; see also Second Annual Report to Congress on the Status of the Harbor Maintenance Trust Fund for Fiscal Year 1993* at 1–2, ¶ 4 (indicating continued compliance) [hereinafter *Second Report*]. This ensures that HMT funds collected from commercial users are spent for their benefit.

In sum, it surely does not violate Congress' intent to construe the HMT as a user fee. The question is whether it is reasonable to interpret it that way. In analyzing whether a particular charge constitutes a user fee, the Court has asked whether it: (1) discriminates against the constitutionally-protected interest; (2) is based on some fair approximation of the use of some system; and (3) is structured to produce revenue fairly apportioned to the total cost to the government of the benefits conferred. *Massachusetts*, 435 U.S. at 464, 98 S.Ct. at 1165–66; *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716–17, 92 S.Ct. 1349, 1355–56, 31 L.Ed.2d 620 (1972).

First, the HMT does not discriminate against exporters. Indeed, the trial court did not hold to the contrary; it simply bypassed the issue and ruled the HMT a tax based on the second and third prongs of the *Massachusetts* test. The HMT is levied against commercial users of United States ports and harbors, including exporters, importers, domestic shippers, and passenger carriers (except ferries, as defined). Congress found these groups to be the principal beneficiaries of harbor operations and maintenance projects. It also required that HMT monies be expended only for their benefit. That the statute exempts some harbor users from payment does not render the HMT discriminatory against exporters. Some exempted users, like recreational users, do not and would not benefit from operations and maintenance projects funded by the HMT because those projects are commercial in nature. Requiring such users to pay the fee would be unfair. Congress made reasonable policy decisions to exempt other users, such as nonprofit organizations transporting humanitarian and development assistance cargo. 26 U.S.C. § 4462(h); *see also id.* § 4462(b) (exempting cargo transported within Alaska, Hawaii, or any United States possession, or between those locales and the United States mainland "because of the high dependence of these islands' economies on waterborne commerce." H.R.Rep. No. 99–228, at 6, *reprinted in* 1986 U.S.C.C.A.N. at 6710). These exemptions do not compromise the HMT's non-discriminatory status.

Second, the HMT is based on a fair, if imperfect, approximation of exporters' use of, or privilege to use, United States harbors and ports. When the government "applies user charges to a large number of parties, it probably will charge a user more or less than it would under a perfect user-fee system." *United States v. Sperry Corp.*, 493 U.S. 52, 61, 110 S.Ct. 387, 394, 107 L.Ed.2d 290 (1989). "Perfect uniformity and perfect equality of taxation, in all the respects in which the human mind can view it, is a baseless dream." *Head Money Cases*, 112 U.S. at 595, 5 S.Ct. at 252. Consequently, the amount of a user fee need not be "precisely calibrated to the use that a party makes of Government services." *Sperry*, 493 U.S. at 60, 110 S.Ct. at 394.

The government concedes that the HMT, like most user fees, is imperfect, but contends that it is a fair approximation of use. U.S. Shoe argues, and the court held, that this is wrong for four primary reasons: (1) all harbor users do not pay the fee, (2) there is no correlation between the charges collected at a particular port and expenditures for that port's maintenance and operations, (3) low-value, bulk cargo importers and exporters use the port facilities to a greater extent than high-value, non-bulk cargo importers and exporters yet pay lower fees, and (4) the ad valorem nature of the fee does not accurately measure use. The first three, of course, are the precise concerns with which the legislature wrestled over three Congresses and more than four years. The fourth challenge is to what Congress found to be "the only acceptable basis on which to impose such charges" because it was "uniform" and "minimizes any possible competitive disadvantages among cargo types and U.S. ports

which otherwise might result from user charges." H.R.Rep. No. 99–228, at 5–6, *reprinted in* 1986 U.S.C.C.A.N. at 6710. "This was obviously the judgment of Congress and we [should] abide by it." *Sperry,* 493 U.S. at 62, 110 S.Ct. at 395. Notwithstanding, I address each issue in turn.

For the same reasons that the HMT is not discriminatory, the fact that all users of our harbors and ports do not pay the fee does not mean it is an unfair approximation of use by those against whom the assessment is levied. *See Evansville,* 405 U.S. at 717–18, 92 S.Ct. at 1355–56 (upholding a user fee as a fair approximation of the use of the facilities for whose benefit they are imposed even though "a majority of the actual number of persons who use facilities of the airports involved" were exempt, because the exemptions were not "wholly unreasonable"). Nor is there merit to U.S. Shoe's second argument that because fees collected at a particular port are not necessarily expended for operations and maintenance at that port, the fee is not a fair measure of use. This is an overly narrow view. Users do not benefit only from access to the particular ports they use. Every exporter has all ports and harbors available to it. Those that never use certain ports benefit from them "in the sense that [they] are available for their use if needed and in that" the provision of better harbor maintenance services "makes the [ports] safer for all users." *Massachusetts,* 435 U.S. at 468, 98 S.Ct. at 1167–68; *see also Sperry,* 493 U.S. at 63, 110 S.Ct. at 395–96.

Finally, U.S. Shoe's related third and fourth arguments do not establish that the HMT is not a fair approximation of use. Initially, there is great irony in the argument that the charge is unfair because high-value, non-bulk cargo carriers are assessed higher fees than low-value, bulk cargo shippers, yet allegedly "use" harbors to a lesser extent. Exporters generally ship low-value cargo, such as grain and coal, which is transported in bulk. *See First Report* at 3, ¶ 9. Importers, on the other hand, tend to ship high-value cargo, like electronics and automobiles, which is not shipped in bulk. *Id.* Consequently, exporters are generally assessed lower fees than importers, yet they purport-

edly "use" the harbors to a greater extent because of the bulk nature of their shipments. Thus, it is the exporters themselves who allegedly are not bearing their fair share.

In addition to the irony, U.S. Shoe's argument is unpersuasive. First, not all bulk cargo is of low value, nor, undoubtedly, is all non-bulk cargo of high value. For example, some "high value" commodities, such as "petroleum," are transported in bulk. *Id.* Thus, to say that the HMT is unfair because low-value cargo carriers use ports to a greater extent than high-value cargo carriers is not wholly accurate. Second, even if a high-value cargo shipper never requires the use of harbors deeper than forty-five feet, there is nothing in the record to support the notion that the only operations and maintenance projects undertaken with HMTF monies are deep-harbor dredging. Indeed, U.S. Shoe does not argue that projects financed with HMTF monies are so limited. While projects are limited to those that inure to the benefit of commercial users, the government has discretion to decide which projects those are. That some users, like exporters, transport some bulk products of lower value than some non-bulk products transported by other users, does not make the HMT a tax. Nor does its ad valorem structure.

It is beyond dispute that an ad valorem charge can be a user fee. *See Sperry,* 493 U.S. at 59–64, 110 S.Ct. at 393–96; *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Auth.,* 906 F.2d 516 (11th Cir.1990); *see also Alamo Rent–A–Car, Inc. v. City of Palm Springs,* 955 F.2d 30 (9th Cir.1992). Notwithstanding, U.S. Shoe attempts to distinguish *Sperry* and *Alamo* on the ground that the parties assessed the user fees in those cases were direct beneficiaries of the provided services. Here, it argues, the direct beneficiaries are the vessel owners, not the importers and exporters who pay the fee. There are two problems with this argument. First, it flies in the face of Congress' finding that exporters are the direct beneficiaries. Congress decided that a portion of federal expenditures needed for port operations and maintenance should be borne by the *direct beneficiaries* of such expenditures, among

whom it obviously included exporters and importers. Second, the Court rejected a similar argument in *Evansville*. There, it held that it is not "particularly important whether the charge is imposed on the passenger himself, to be collected by the airline, or on the airline, to be passed on to the passenger if it chooses." 405 U.S. at 714, 92 S.Ct. at 1354. Similarly, here it is unimportant whether the fee be assessed against exporters and importers, the ultimate beneficiaries of the harbor maintenance and operations projects, or against the actual vessel owner, to be passed on to the importers or exporters if it chooses.

Finally, the HMT is structured to produce revenue fairly apportioned to the total cost to the government of the benefits conferred. The relevant inquiry is whether Congress *structured* the HMT so that the monies collected under it are "fairly apportioned" to the government's cost of providing commercial harbor maintenance services. U.S. Shoe argues, and the trial court held, that the HMT fails this prong for two primary reasons: (1) it funds projects yet to be commenced rather than reimbursing the government for completed projects, and (2) the HMTF has accumulated a large surplus. The first objection is misplaced; the second, while troubling, is unavailing.

Regardless of the factual accuracy of U.S. Shoe's first concern,[5] when viewed in light of the purposes for which the HMT was enacted, it is of little relevance that HMT monies might fund port operations and maintenance projects not completed, or even initiated, at the time of collection. The HMT is not a short-term fix to the myriad problems that plague our nation's waterborne commerce. It is a long-term vehicle to improve and to maintain the harbors for the continuing benefit of United States commerce. Indeed, Congress expressly found that the fee will facilitate economic development. "[A] surplus of revenue over outlays in any one year can be offset against actual deficits of past years

and *perhaps against projected deficits of future years." Massachusetts,* 435 U.S. at 470 n. 25, 98 S.Ct. at 1168 n. 25 (emphasis added). The Eleventh Circuit has also recognized that user fees may be expended on future projects. In *Alamo,* it held that "given the long term nature of maintaining and developing an airport, it was appropriate ... to factor in future development plans when setting user fees." 906 F.2d at 522. Thus, it is of little moment that HMT monies are purportedly expended to fund projects not yet started rather than to repay the government for services that have already been rendered.

Similarly, the fact that the HMTF enjoys, or perhaps suffers, a large surplus does not resolve whether Congress structured the HMT as a tax or a user fee. To be sure, the substantial surplus weighs against finding the HMT a user fee. But this does not, of itself, render it a tax. A closer look reveals that the HMT's structure was not ill-conceived. From 1987 through 1990, during which the HMT was only 0.04% ad valorem and paid just 40% of eligible Corps costs, revenues and expenditures were closely aligned. *See First Report* at 6, ¶ 13. For example, in FY 1988, HMTF expenditures actually *exceeded* revenues by approximately $6 million, and the ending balance was just $9 million. *Id.*

Trouble began in 1991, when Congress increased the ad valorem rate to 0.125% in order to fund 100% of eligible Corps expenses and to reimburse the National Oceanic and Atmospheric Administration (NOAA) $45.5 million for its annual commercial navigation costs. While the revenue generated under the higher rate was only slightly less than projected, expenditures were considerably less, resulting in a growing HMTF surplus. Withdrawals from the HMTF were less than anticipated due primarily to (1) the absence of legislation authorizing NOAA to receive its commercial navigation costs, (2)

---

5. The *First Report* states that "the actual transfer of funds from the [HMTF] is for expenditures made in the previous fiscal year. In other words, FY 1990 expenditures are shown as transfers from the [HMTF] in FY 1991, and so forth. Corps expenditures are never made directly from

the [HMTF], nor are transfers made on the basis of estimates or projections." *First Report* at 3, ¶ 7. This indicates that FY 19xx projects are reimbursed from the HMTF with FY 19xx, or perhaps surplus, funds in FY 19xx + 1.

the fact that the Corps' operations and maintenance budget was lower than had been projected in 1990 when the new ad valorem rate was established, and (3) withdrawals from the HMTF for improved administration and enforcement, while authorized, remained unappropriated. *See, e.g., Second Report* at 5, ¶ 10.

The surplus has certainly burgeoned in recent years as a result of these unforeseen decreases in projected expenditures, but that does not mean that the HMT's structure shows it to be a tax. Congress is not prescient. In fact, the government recognizes that this is a problem about which something must be done. *See Third Annual Report to Congress on the Status of the Harbor Maintenance Trust Fund for Fiscal Year 1994* at 7, ¶ 16 ("The growing surplus in the HMTF remains. This can only be corrected by widening the authorized uses for HMTF monies, or by reducing the HMF [sic] to a level consistent with its annual expenditures."). Congress has already amended the HMT statute once. There is no reason to believe that it will not correct the growing surplus. Until then, commercial users know that all HMT monies plus interest may only be expended for harbor operations and maintenance projects with commercial purposes.

They may not be used for the general support of the government. *See Northwest Airlines, Inc. v. County of Kent,* 510 U.S. 355, 371–72, 114 S.Ct. 855, 865–66, 127 L.Ed.2d 183 (1994) (declining to decide whether an airport user fee, which had accumulated "huge surpluses," was excessive under *Evansville,* in part because all fees collected had to be expended for the airport's capital or operating costs, and the airlines challenging the fee had not suggested that the surplus was being used for any purpose other than airport-related expenses); *Head Money Cases,* 112 U.S. at 596, 5 S.Ct. at 253 (charges imposed on shipowners for each immigrant they brought into the United States, which were deposited into an "immigrant fund" appropriated in advance for the temporary care of passengers whom shipowners transported, was not a tax).

I would reverse the judgment of the Court of International Trade.