**Slip Op. 99-91**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| _____ | : | |
| AMOCO OIL COMPANY, | : | Court No. 95-07-00971 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

[Defendant's motion to dismiss granted]

Dated: September 1, 1999

Barnes, Richardson, & Colburn (Robert E. Burke, Lawrence M. Friedman, Christopher E. Pey, Melissa Miller, Aaron Gothelf) for plaintiffs.

David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jeanne E. Davidson, Todd M. Hughes and Lara Levinson), Richard McManus, Office of the Chief Counsel, United States Customs Service, of counsel, for defendant.

## OPINION

**RESTANI, Judge:** This matter is before the court on Defendant's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted pursuant to USCIT R. 12(b)(5). In this action, Plaintiff challenges the constitutionality of the Harbor Maintenance Tax ("HMT"), established by 26 U.S.C. §§ 4461, 4462 (1994), on its imports into the United States.

### I.   JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1581(a).[1]  See Thomson Consumer Elecs. v. United States, No. 95-03-00277-S, slip op. 99-84, at 4-5 (Ct. Int'l Trade Aug. 17, 1999).

### II.   STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, factual allegations made in the complaint are assumed to be true and all inferences are drawn in favor of the plaintiff.  See, e.g., Mitchell Arms, Inc. v. United States, 7 F.3d 212, 215 (Fed. Cir. 1993).  Dismissal is proper only "where it appears beyond doubt that plaintiff can prove no set of facts which would entitle him to relief."  Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1565 (Fed. Cir. 1988).

### III.   BACKGROUND

The HMT is an ad valorem tax on commercial cargo involved in "any port use," including imports.  See 26 U.S.C. § 4461(a) (1996).  The HMT is contained in Title XIV[2] of the Water

---

[1]   Amoco claims 28 U.S.C. § 1581(i) jurisdiction for its few entries of imports into a foreign trade zone.  This issue was not adequately briefed by the parties.  The Government, however, does not challenge that jursidiction is proper under § 1581.  As the court is denying relief on the merits, it does not resolve which subsection of § 1581 applies to such entries.

[2]   Harbor Maintenance Revenue Act of 1986 ("HMRA"), P.L. 99-662, Title XIV, § 1402(a), 100 Stat. 4266 (1986).

Resources Development Act of 1986 ("WRDA" or "Act"), Pub.L. No.
99-662, 100 Stat. 4082 (1986).  The HMT was intended to finance
the general maintenance of U.S. ports.[3]  S. Rep. No. 99-126, at
9-10 (1985), reprinted in 1986 U.S.C.C.A.N. 6639, 6646-47.

Plaintiff Amoco Oil Company ("Amoco") imports goods by sea
and alleges that, between 1993 and 1995, it made HMT payments
upon imports in excess of $1,000,000.  Amoco claims that the HMT
on imports, 26 U.S.C. § 4461(c)(1)(A), is unconstitutional in
light of the Supreme Court's decision in United States v. U.S.
Shoe Corp., 523 U.S. 360 (1998), aff'g 114 F.3d 1564 (Fed. Cir.
1997), aff'g 19 CIT 1284, 907 F. Supp. 408 (1995).  In U.S. Shoe,
523 U.S. at 370, the Supreme Court held that the export provision
of the HMT, 26 U.S.C. § 4461(c)(1)(B), violates the Export Clause
of the Constitution.  U.S. Const. art. I, § 10, cl. 2.

Amoco argues that the HMT on imports should be declared
invalid because it is not severable from the unconstitutional HMT
on exports.  Defendant, United States Customs Service
("Customs"), argues that this court, in Carnival Cruise Lines v.
United States, 20 CIT 704, 706-11, 929 F. Supp. 1570, 1572-77

---

[3]     Amoco suggests that the Supreme Court, in United States v.
U.S. Shoe Corp., 523 U.S. 360 (1998), held that the HMT is a
general revenue-raising tax, not a fee for port maintenance.
This contention is misplaced.  That the HMT does not meet the
strict requirement for a "user fee" pursuant to Export Clause
jurisprudence does not alter the purpose or the function of the
HMT in general.  The HMT has been and continues to be a funding
mechanism for harbor maintenance.

(1996), already held that the HMT on exports is severable, and therefore, Plaintiff's complaint fails to state a claim upon which relief can be granted.

Amoco also argues the HMT violates the Uniformity Clause, U.S. Constitution, art.1, § 8, cl. 1., and the Port Preference Clause, U.S. Constitution, art. 1, § 9, cl. 6.[4]

## IV. DISCUSSION

### A. Severability

It is well-established that unconstitutional provisions of a statute are severable if: (1) the remaining provisions of the statute are independently operative as law, and (2) the remaining statute will function in a manner consistent with the intent of Congress. See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684-85 (1987); INS v. Chadha, 462 U.S. 919, 931-35 (1983); Buckley v. Valeo, 424 U.S. 1, 108-09 (1976); United States v. Jackson, 390 U.S. 570, 585-91 (1968); Champlin Refining Company v. Corporation Commission of Oklahoma, 286 U.S. 210, 234 (1932) ("Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."). Cf. Minnesota v. Mille Lacs Band of

---

[4]     Defendant does not dispute that Amoco has standing to raise a constitutional claim under both clauses. As relief is not granted, it is not necessary to explore this issue further.

Chippewa Indians, 119 S.Ct. 1187, 1198-99 (1999) (applying two-part test in context of Executive Order).

In Carnival Cruise Lines, the court held that the unconstitutional HMT on exports is severable from "the remainder of the HMT, in particular those portions of the statute that involve [Carnival's] operations as shippers providing passenger services."  20 CIT at 712, 929 F. Supp. at 1577.[5]  The court determined that the HMT on exports was severable because (1) the HMT statute still functioned absent the export provision, see 20 CIT at 706-07, 929 F. Supp. at 1572-73, and (2) plaintiffs failed to provide "strong evidence" that Congress did not intend the export provision to be severable, particularly in light of the WRDA's severability clause.  20 CIT at 709, 929 F. Supp. at 1575.

Amoco argues that Carnival Cruise Lines is not dispositive because the court did not address Congressional concerns regarding potential violations of international obligations under the General Agreement on Tariffs and Trade ("GATT").  As the extent to which the court should apply stare decisis principles is unclear, and as this is a new argument, the court will consider the issue of severability.

---

[5]    The court has since determined that the HMT on passenger services is unconstitutional, see Carnival Cruise Lines, Inc. v. United States, No. 93-10-00691, 1998 WL 299348, at *3 (Ct. Int'l Trade June 2, 1998) (appeal pending); however, the basic premise that the HMT on exports is severable from the remaining provisions of the HMT is unchanged.

With respect to the first inquiry, the court has held that the HMT, as a whole, still functions without the HMT on exports. See Carnival Cruise Lines, 20 CIT at 707, 929 F. Supp. at 1573 ("[N]either of the 'export' provisions are essential to the functioning of the [HMT] in relation to the remaining categories of liability for port use."). Plaintiff makes no argument to the contrary. It is the second question, that of Congressional intent, upon which Plaintiff's claims primarily rely. With respect to Congressional intent, the standard is clear: "the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted." Alaska Airlines, 480 U.S. at 685 (emphasis added).

Where Congress has included a severability clause, the objectionable provision must be severed unless there is "strong evidence" that Congress intended otherwise. Alaska Airlines, 480 U.S. at 686. See also Chadha, 462 U.S. at 932; Champlin Refining, 286 U.S. at 234-35. Thus, the enactment of a severability provision within the WRDA, 33 U.S.C. § 2304,[6] creates a presumption that Congress did not intend the validity

---

[6]    The severability clause of the WRDA provides: "If any provision of this Act, or the application of such provision of this Act to any person or circumstance, is held invalid, the application of such provision to other persons or circumstances, and the remainder of this Act, shall not be affected thereby." 33 U.S.C. § 2304.

of the HMT as a whole to depend on the validity of
constitutionally-offensive provisions.  In <u>Carnival Cruise Lines</u>,
the court found that the legislative history of the WRDA did not
provide sufficient evidence to rebut this presumption of
severability.  20 CIT at 708-11, 929 F. Supp. at 1574-77.  Amoco
argues that proof of Congressional concerns regarding
international obligations would have provided the strong evidence
necessary to reject severability.[7]  According to Amoco, Article
VIII of the GATT requires signatory countries to reciprocate
"national treatment" by ensuring that taxes and other charges are
not applied to goods imported from member countries in a way that
protects a domestic industry.[8]  The core of Amoco's argument,

---

[7]     On the basis of this argument, Plaintiff Amoco requested
that the court allow a period of discovery before ruling on this
motion to dismiss.  Because the issue of severability is a legal
(not factual) question of statutory construction and
Congressional intent, however, discovery beyond those public
records already available would not have aided Plaintiff's case.
Documents and individual thoughts not made public at the time of
passage do not establish the intent of Congress as a whole.  The
court therefore denies Plaintiff's request for discovery.

[8]     Article VIII provides, in relevant part:

    All fees and charges of whatever character (other than
    import and export duties and other than taxes within
    the purview of Article III) imposed by contracting
    parties on or in connexion with importation or
    exportation shall be limited in amount to the
    aproximate cost of services rendered and shall not
    represent an indirect protection to domestic products
    or a taxation of imports or exports for fiscal
    purposes.

(continued...)

therefore, is that Congress would not have passed the HMT on imports without the HMT on exports because the result would be inconsistent with United States obligations under GATT.

Amoco's argument is based on the premise that an HMT on imports alone violates the GATT because it would necessarily protect the domestic industry (exporters), which is not required to pay the tax.[9]  Curiously, Amoco's own Congressional excerpts support the opposite:  "While an import surcharge may not be GATT illegal, it is true that most countries have been reluctant to impose them due to possible adverse GATT implications."  The Problems with Import Surcharges, 131 Cong. Rec. 3533, 3533 (Feb 26, 1985) (emphasis added).

Even if an HMT upon imports and not exports would violate the GATT, it is entirely within Congress' power to pass such a tax.  If a statute is inconsistent with international obligations, "it is a matter for Congress and not [the] court to decide and remedy."  Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 668 (Fed. Cir. 1992).  See also Federal-Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995); Campbell Soup Co., Inc. v. United States, 18 CIT 440,

---

[8](...continued)
   GATT, Art. VIII(a).

[9]    With very limited exceptions, the tax is also required for shipments between domestic ports by everyone, including domestic shippers.  See 26 U.S.C. § 4461(c)(1)(C).

453, 853 F. Supp. 1443, 1453 (1994). Therefore, the issue is not whether an HMT on imports alone violates the GATT, but whether Congress was so fearful of negative GATT implications that it would not have enacted the HMT on imports without the HMT on exports.

There is some evidence to support such an argument. A report issued by the House Merchant Marine and Fisheries Committee explicitly recognized the possibility of conflict with the United States' GATT obligations if the HMT were to be "construed [as] a revenue-raising measure."  H.R. Rep. No. 99-251(IV), at 24 (1985).  In testimony before the House Ways and Means Committee, one witness even stated that the export provision had been included for the sole of purpose of avoiding conflicts with the GATT.[10]  See Water Resources Conservation, Development, and Infrastructure Improvement Act of 1985: Hearing Before the House Committee on Ways and Means on H.R. 6, 99th Cong. 37 (1985).

The inclusion of a general severability clause, however,

---

[10]   During public hearings before the House Committee on Ways and Means concerning the HMT, Representative Gradison asked representatives of the Department of the Army and Customs Service whether the U.S. had considered imposing the tax only on imports. Richard Abbey, Chief Counsel of the Customs Service, replied that "imposing [the HMT] only on imports would present significant GATT problems, and for that reason alone it was decided to impose the [tax] on both exports and imports and on movements on the inland waterways."  Water Resources Conservation, Development, and Infrastructure Improvement Act of 1985: Hearing Before the House Committee on Ways and Means on H.R. 6, 99th Cong. 37 (1985).

suggests that Congress did envision an Act without the HMT on

exports.  See Alaska Airlines, 480 U.S. at 686.  Indeed, a report

from the House Committee on Merchant Marine and Fisheries

recommending an HMT-specific severability clause[11] confirms that

Congress contemplated the survival of the HMT should the export

provision be declared invalid:

> The concern of the Committee and the subject of the
> amendment was, for example, that the constitutional
> arguments that have been made against imposing a tax on
> exports might result in the legislation being declared
> invalid and it was the desire of the Committee to
> preserve all other provisions of the Act if that or a
> similar provision be found invalid.

H.R. Rep. No. 99-251(IV), at 30 (emphasis added).

The court notes, however, the absence of the HMT-specific

severability clause in the final version of the WRDA.  It is

unclear from the legislative history whether the omission

indicates that Congress believed the general severability clause,

33 U.S.C. § 2304, alone would sufficiently address HMT

severability concerns or that Congress intentionally removed

---

[11]    House bill H.R. 6 originally contained a severability
clause, Section 116, which provided for severability in the event
that the HMT on exports was held to be unconstitutional.  Section
116 provided as follows:
> [i]f section 110 of this title [the HMT] is held
> invalid, all valid parts [of the Act] that are
> severable from section 110 remain in effect.  If
> section 110 of this title is invalid in one or more of
> its applications, section 110 remains in effect in all
> valid applications that are severable from invalid
> applications.
H.R. Rep. No. 99-251(IV), at 13 (emphasis added).

severability from the HMT.  The court in <u>Carnival Cruise Lines</u>
addressed, at length, its reasons for rejecting the latter
interpretation[12]  20 CIT at 707-11, 929 F. Supp at 1573-77.
Without more support, this court, too, concludes it unwise to
speculate as to Congress' intent in removing HMT-specific
severability.

Assuming <u>arquendo</u> that two committee reports from the same
house evidence the collective legislative intent, Congress seems,
at best, conflicted. Combining the excerpts, it appears that
Congress was faced with the following dilemma in its search to
fund the WRDA: include the HMT on exports and risk the Act being
declared unconstitutional or exclude the provision and risk the

---

[12]    The court addressed plaintiff's argument that the HMT was a
"freestanding" provision beyond the scope of the WRDA's
severability clause as follows:

> Plaintiffs in essence are contending that by the
> structure of the WRDA, Congress did not intend the
> severability clause to apply to a specific provision
> (tax on exports), but to a larger more general
> provision (the HMT), but not to a larger, even more
> general provision (the HMRA (Title XIV of the WRDA)),
> if it applies at all; and that by the history of the
> WRDA, Congress was concerned that the tax on exports
> would jeopardize the entire WRDA, so it included a
> severability clause in the WRDA to ensure that the tax
> on exports could be severed from the remaining
> provisions of the statute, thereby taking those
> remaining provisions of the WRDA out of jeopardy; but
> that the severability clause is to be applied so that
> the remaining valid provisions of the HMT would be
> severed from the WRDA as well.  The Court finds the
> logic of these arguments untenable.

<u>Carnival Cruise Lines</u>, 20 CIT at 707, 929 F. Supp. at 1573-74.

Act violating the GATT.  In response, Congress included the HMT
on exports and kept the general severability clause.  This does
not indicate that Congress' overriding concern was the potential
violation of GATT but that it was one of many concerns.  On
balance, this is insufficient to rebut the strong presumption of
severability.

Federal courts are required to interpret statutes so as to
maintain, rather than destroy, their constitutionality.  See
Robertson v. Seattle Audubon Soc'y, 503 U.S. 429, 441 (1992).
"In exercising its power to review the constitutionality of a
legislative Act, a federal court should act cautiously. A ruling
of unconstitutionality frustrates the intent of the elected
representatives of the people. Therefore, a court should refrain
from invalidating more of the statute than is necessary."
Regan v. Time, 468 U.S. 641, 652 (1984) (plurality decision).

Consequently, this court must err on the side of
severability, particularly when the invalidation of the provision
would effectively destroy the Act.[13]  See NLRB v. Jones &
Laughlin Steel Corp., 301 U.S. 1, 30 (1937) ("[A]s between two
possible interpretations of a statute, by one of which it would
be unconstitutional and by the other valid, our plain duty is to

---

[13]   A determination that provisions within the HMT are not
severable would, obviously, require the court to strike down the
entire HMT.  Such action would essentially destroy the WRDA by
eliminating its primary source of funding.

adopt that which will save the act."). In light of the severability clause and consistent with our mandate to preserve Congressional Acts where possible, the court holds that the HMT on exports is severable from the remainder of the HMT.

**B. Uniformity Clause**

Amoco next argues that the HMT violates the Uniformity Clause of the Constitution. The Uniformity Clause requires that "all Duties, Imposts and Excises . . . be uniform throughout the United States . . . ." U.S. Constitution, art.1, § 8, cl. 1. Amoco contends that the HMT violates the Uniformity Clause because it is not equally assessed upon all ports or states. The clause, however, "does not require Congress to devise a tax that falls equally or proportionately on each State." United States v. Ptasynski, 462 U.S. 74, 82 (1983). It simply requires that the tax operate "with the same force and effect in every place where the subject of it is found." Head Money Cases, 112 U.S. 580, 594 (1884)(upholding a tax upon seaport immigration but not upon inland immigration).

The subject of the HMT is commercial cargo involved in "any port use." 26 U.S.C. § 4461 (a). The HMT contains exemptions for certain domestic shipments Alaska and Hawaii, see 26 U.S.C. § 4462(b), as well as a "special rule" for certain ports in

Washington and Oregon.[14]   26 U.S.C. § 4462(a)(2)(C).

Consequently, Amoco contends that the HMT is not "uniform in its

operation in all ports of the United States . . . ." Head Money

Cases, 112 U.S. at 594.

The Uniformity Clause does not, however, prohibit Congress

from enacting geographically-specific taxes. See Ptasynski, 462

U.S. at 83-84 (citing Head Money Cases, 112 U.S. at 595).

"[W]here Congress does choose to frame a tax in geographic terms,

[courts] will examine the classification closely to see if there

is actual geographic discrimination." Id. at 85 (citing Regional

Rail Reorganization Act Cases, 419 U.S. 102, 160-61 (1974)).

Courts must determine whether Congress intended to grant an undue

preference to certain ports at the expense of others. See id. at

85-86.

The Alaska and Hawaii exemptions were enacted to prevent,

not encourage, geographic discrimination.  Alaska and Hawaii are,

for obvious reasons, geographically unique.  Both states rely

more heavily upon shipping networks than do mainland states.[15]

---

[14]   Section 4462(a)(2)(C) of Title 26 provides that "[t]he term 'port' shall include the channels of the Columbia River in the States of Oregon and Washington only up to the downstream side of the Bonneville lock and dam."

[15]   In requesting the exemption for Hawaii, Congressman Cec Heftel stated:
        Hawaii and the territories are unique because they
    are islands.  Virtually everything going in and out
                                              (continued...)

An <u>ad valorem</u> tax upon shipped goods affects citizens of those states substantially more than those of mainland states.

Recognizing the inequity, Congress carefully drafted exemptions specifically to exclude domestic goods loaded or unloaded in Hawaii and Alaska, but limited the exemptions to goods for consumption.  <u>See</u> 26 U.S.C. § 4462(b)(1)(A)-(C).  By exempting only consumption goods, Congress merely offset the burden that Hawaii and Alaska alone would have had to bear, without completely exempting either state from the tax.  As such, the court finds no geographic discrimination favoring Alaska and Hawaii.

The special rule for Washington and Oregon appears equally

---

(...continued)
    must travel by ship.  We have no choice.  We cannot truck commodities in.  We cannot send them by rail. The cost of air freight is prohibitive . . . .
       A port user fee, therefore, would be levied on over 80% of all the state's goods and materials.  No other state would be so severely affected . . . .
       Another aspect of the issue worth considering in the light of fairness is the fact that most ports on the Mainland are distribution terminals for import cargo and consolidation and shipping terminals for export cargo.  In our case, ports serve their immediate area, not wide regions, and the cost of the user fees cannot therefore be spread among many users as it can in the other areas . . . .
       A terminal port city like Honolulu can spread the cost among only a few.  Distibution [sic] centers like Baltimore spread their cost among millions.

<u>Water Resources Conservation, Development, and Infrastructure Improvement Act of 1985: Hearing Before the House Committee on Ways and Means on H.R. 6</u>, 99th Cong. 30 (1985).

benign.  Section 4462(a)(2)(C) of Title 26 geographically
demarcates those channels of the Columbia River which are
considered "ports" for the purposes of the HMT.  Amoco argues
that the special rule unduly benefits channels which may have
attributes of ports, but are not defined as such because they are
located above the Bonneville dam.

For the purposes of the WRDA, the Columbia River is divided
into two sections.  The first section is subject to the HMT and
includes that part of the river below the Bonneville lock and
dam.  See 26 U.S.C. § 4462(a)(2)(C).  That portion includes the
river's seven largest and most active ports.[16]  The remainder of
the river is governed by the Inland Waterways Tax.  See 33 U.S.C.
§ 1804(8).  Such division is neither unique nor unusual.[17]

---

[16]    The seven lower ports include, in Oregon, Portland, St.
Helens, and Astoria; and, in Washington, Vancouver, Woodland,
Longview, and Kalama.  See H.R. Rep. No. 106-106(I), at 146-47
(1999).  "[The L]ower Columbia River Ports have been the primary
shipping point for West Coast grain and feed grain exports for
many years.  More than 38 million tons of commerce valued at $9
billion were shipped to or from Lower Columbia River ports in
1995."  Id. at 147.

[17]    It should be noted that different portions of the same river
system will fall within title 5 [Inland Waterways Tax] and
title 6 [HMT].  For example, the Mississippi System as far
south as Baton Rouge, La., is considered a component of the
inland system; below Baton Rouge it would fall under the
provisions of this title [HMT].  That portion of the
Columbia River upstream of Bonneville Lock and Dam
(including the actual lock and dam) falls under title 5
[Inland Waterways Tax], while the navigational work
downstream from Bonneville Dam comes under this title [HMT].

(continued...)

Thus, the rule seems less an exemption than a definition. The rule is located, not with other acknowledged exemptions, but within the subsection defining "port." See 26 U.S.C. § 4462(a)(2). The HMT defines "port" as any channel or harbor in the U.S. that is "not an inland waterway." Id. (emphasis added). It seems clear that Congress intended the section of the Columbia River that is more like a port to be defined as a port and the portion of the river that is more like an inland waterway to be defined as such.[18] As both are taxed appropriately, the court finds no geographic discrimination.

Because the geographically-specific provisions of the HMT do not result in discriminatory preference, the court holds that the HMT does not violate the Uniformity Clause.

**C. Port Preference Clause**

Finally, Amoco argues that the HMT is incompatible with the Port Preference Clause, which requires that "[n]o Preference . . . be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another . . . ." U.S. Constitution,

---

(...continued)

S. Rep. No. 99-126, at 52-53 (1985), reprinted in 1986 U.S.C.C.A.N. 6639, 6673-74.

[18] In enacting the WRDA, Congress recognized that the Lower Columbia River would increasingly be used as a port: "Increased trade between the Pacific Northwest states and the Pacific Rim nations has accentuated the need for a deepened navigation channel in the Lower Columbia River, to accommodate larger, deeper-draft vessels." H.R. Rep. 106-106(I), at 147.

art. I, § 9, cl. 6.  The Port Preference Clause was intended to protect states, as opposed to individual ports or regions, from Congressional regulation that intentionally discriminates against one state's ports to the advantage of another's.  See Armour Packing Co. v. United States, 209 U.S. 56, 80 (1908); see also Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. 421, 435 (1856) ("[W]hat is forbidden is, not discrimination between individual ports within the same or different States, but discrimination between States").  The clause has rarely been invoked and has never been used to successfully invalidate a Congressional Act.  See Kansas v. United States, 16 F.3d 436, 439 (D.C. Cir. 1994) ("[The Port Preference Clause] has never been relied on by the federal judiciary to hold an act of Congress unconstitutional.").

A violation of the Port Preference Clause requires that an Act explicitly discriminate against the ports of a particular state.  See City of Milwaukee v. Yeutter, 877 F.2d 540, 546 (7th Cir. 1989) ("For two hundred years courts have understood that only explicit discrimination violates the Port Preference Clause").  Amoco fails to allege that Congress explicitly discriminated against particular states in enacting the HMT. Rather, Amoco argues that application of the HMT results in de facto preferences that benefit certain states.

Congress may, however, enact laws that "greatly benefit

particular ports and which incidentally result to the disadvantage of other ports in the same or neighboring states." Louisiana Public Service Comm'n v. Texas & New Orleans R.R., 284 U.S. 125, 131 (1931). See also Armour Packing Co. v. United States, 209 U.S. 56, 80 (1908) ("The fact that regulation, within the acknowledged power of Congress to enact, may affect the ports of one State more than those of another, cannot be construed as a violation of [the Port Preference Clause].").

The ultimate question, therefore, is not whether the Act results in a preference, but whether Congress explicitly discriminated against a particular state. Because Amoco failed to identify any particular state against which Congress intentionally discriminated, this court holds that the HMT does not violate the Port Preference Clause.

The motion to dismiss is granted.

_____
Jane A. Restani
Judge

Dated:    New York, New York

This 1st day of September, 1999.

**ERRATA**

<u>Amoco Oil Co. v. United States</u>, Court No. 95-07-00971, Slip Op. 99-91, dated September 1, 1999.

At p. 13, line 21, insert the words "from and to" after "domestic shipments".

January 28, 2000.