THOMSON MULTIMEDIA INC. (now known as Thomson Inc.), Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

CF Industries, Inc., Plaintiff–Appellant,

v.

United States, Defendant–Appellee.

Nos. 03–1044, 03–1137.

United States Court of Appeals, Federal Circuit.

Aug. 18, 2003.

J. Kevin Horgan, DeKieffer & Horgan, of Washington, DC, argued for plaintiff-appellant in 03–1044. Of counsel on the brief were Robert B. Silverman, Grunfeld, Desiderio, Lebowitz, Silverman and Klestadt LLP, and Michael T. Cone, Coudert Brothers LLP, of New York, NY. Of counsel on the brief was Richard K. McManus, Senior Attorney, Office of Chief counsel, Bureau of Customs and Border Patrol, of Washington, DC.

Daniel G. Jarcho, McKenna Long & Aldridge LLP, of Washington, DC, argued for plaintiff-appellant in appeal 03–1137. With him on the brief was Peter Buck Feller.

Jonathan S. Lawlor, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee in appeals 03–1044 and 03–1137. With him on the briefs were David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Todd M. Hughes, Assistant Director. Of counsel on the briefs was Richard K. McManus, Senior Attorney, Office of Chief Counsel, Bureau of Customs and Border Patrol, of Washington, DC.

Before NEWMAN, MICHEL, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

Plaintiff-appellant Thomson Multimedia Inc. ("Thomson") appeals from the United States Court of International Trade's grant of summary judgment in favor of the United States. *Thomson Multimedia Inc. v. United States,* 219 F.Supp.2d 1322 (Ct.

Int'l Trade 2002). The court granted summary judgment because it held that the Harbor Maintenance Tax ("HMT"), 26 U.S.C. §§ 4461–4462 (2000), as applied to imports, was constitutional in light of both the Uniformity, Art. I, § 8, cl. 1, and Port Preference, Art. I, § 9, cl. 8, Clauses of the U.S. Constitution. Plaintiff-appellant CF Industries, Inc. ("CF Industries") appeals from a separate grant of summary judgment in favor of the United States by the Court of International Trade. The trial court granted summary judgment in that case because, based upon its interpretation of the Uniformity and Port Preference Clauses in *Thomson,* the HMT as applied to domestic unloadings was also constitutional. Given their interdependency, we address these two, separate appeals in a single decision. Because we hold that the HMT as applied to imports and domestic unloadings is a user fee rather than a tax and because we hold that the various exemptions in the HMT do not violate the Port Preference Clause of the Constitution, we affirm the Court of International Trade's decisions in both cases.

## BACKGROUND

The HMT was enacted as part of the Water Resources Development Act of 1986 ("WRDA"), Pub.L. 99–662, 100 Stat. 4082. Congress intended the HMT to help finance the general maintenance and improvement of ports in the United States. S.Rep. No. 99–126, at 9–10 (1985), *reprinted in* 1986 U.S.C.C.A.N. 6639, 6640–47. The HMT imposes an *ad valorem* charge of 0.125 percent of the value of the commercial cargo involved in "any port use." 26 U.S.C. § 4461(b). The statute defines the term "port" as "any channel or harbor (or component thereof) in the United States, which ... (i) is not an inland waterway, and (ii) is open to public navigation." *Id.* § 4462(a)(2)(A); *see also id.* § 4462(a)(2)(B)-(C). The statute defines "port use" as, in the case of imports and domestic shipments, "the unloading of commercial cargo from, a commercial vessel at a port." *Id.* § 4462(a)(1)(B); *see also id.* § 4461(c)(2). The statute sorts commercial cargo into three categories: (1) "cargo entering the United States" (i.e., imports); (2) "cargo to be exported from the United States" (i.e., exports); and (3) "any other case" (i.e., domestic cargo). *Id.* § 4461(c)(1). A separate statute establishes the Harbor Maintenance Trust Fund ("HMT Fund") for revenue raised by the HMT to be expended on the operation and maintenance of channels and harbors. *Id.* § 9505.

Importantly for these appeals, the HMT contains several implicit and explicit exemptions. First, the statute effectively exempts "inland waterway[s]" from HMT liability by excluding them from the statute's definition of "port." 26 U.S.C. § 4462(a)(2)(A)(ii). Second, the statute effectively exempts from the HMT part of the Columbia River by including channels of that river "only up to the downstream side of Bonneville lock and dam." *Id.* § 4462(a)(2)(C). Third, the statute explicitly exempts from the HMT domestic cargo (excluding crude oil) either unloaded in Hawaii, Alaska, or U.S. possessions or unloaded in the continental United States and shipped from Alaska, Hawaii, or a U.S. possession. *Id.* § 4462(b).

In the trial court, the two plaintiff-appellants challenged the HMT as applied to domestic unloadings and imports. Thomson is an importer of consumer electronic products and pays over $1 million per year in HMTs. Thomson argued the HMT is unconstitutional because: (1) the unconsti-

tutional export provision [1] is not severable from the rest of the statute; (2) it violates the Uniformity Clause of the Constitution because it causes a geographical bias by exempting Alaska and Hawaii, a 47.5 mile segment of the Columbia River, and inland waterways; and (3) it violates the Port Preference Clause of the Constitution by exempting Alaska and Hawaii, a 47.5 mile segment of the Columbia River, and inland waterways.

CF Industries is a domestic shipper of phosphate fertilizer that paid a total of $323,416 in HMTs from December 1999 to June 2002. CF Industries argues only that the HMT as applied to domestic unloadings violates both the Uniformity and Port Preference Clauses of the Constitution because it exempts domestic unloadings of cargo in Alaska and Hawaii.

The Court of International Trade dealt with these issues in its *Thomson* opinion granting summary judgment in favor of the government. 219 F.Supp.2d. at 1322–32. First, it held that the import clause was severable from the HMT on exports "because the Federal Circuit has 'specifically held that the unconstitutional export provision in the HMT is severable from the remainder of the statute.'" *Id.* at 1324 (quoting *Amoco Oil Co. v. United States*, 234 F.3d 1374, 1377 (Fed.Cir.2000)); *see also Princess Cruises, Inc. v. United States*, 201 F.3d 1352, 1358 (Fed.Cir.2000); *Carnival Cruise Lines, Inc. v. United States*, 200 F.3d 1361 (Fed.Cir.2000). Second, the trial court held the HMT as applied to imports was a "tax" rather than a "user fee" based upon its decision in *United States Shoe Corp. v. United States*, 907 F.Supp. 408 (Ct. Int'l Trade 1995) (holding

the HMT as applied to exports was a tax because it did not satisfy the second and third prongs of the three-prong test established in *Massachusetts v. United States*, 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978)). Third, the trial court interpreted both the Uniformity and Port Preference Clauses of the Constitution as prohibiting only geographic (or port) distinctions effectively designed to promote state versus state or region versus region favoritism or discrimination. *Thomson*, 219 F.Supp.2d at 1326, 1330–31. As such, the court held the exemptions at issue did not violate either clause because: (1) the Alaska and Hawaii exemptions were narrowly tailored attempts by Congress to address the geographically isolated problem of those two places being heavily dependent on ocean transportation for domestic consumption; (2) the Columbia River "exemption" was more likely an oversight or a simple geographic distinction between "inland waterways" and "ports" and there was no evidence of actual benefit to the "exempted" ports; (3) the exemption of the inland waterway ports did not indicate any state or regional discrimination. Subsequently, the Court of International Trade applied these holdings to CF Industries and granted summary judgment in favor of the government. *CF Indus., Inc. v. United States*, No. 02–00281, 2002 Ct. Intl. Trade LEXIS 138, at *2 (Ct. Int'l Trade Nov. 26, 2002).

On appeal, Thomson challenges each holding of the trial court (except for the holding that the HMT was a tax) and CF Industries challenges the court's holding that the Alaska and Hawaii domestic exemptions do not violate the Uniformity or Port Preference Clause. The government

---

1. In *United States v. United States Shoe Corp.*, 523 U.S. 360, 370, 118 S.Ct. 1290, 140 L.Ed.2d 453 (1998), the Supreme Court held

that the HMT as applied to exports was unconstitutional because it violated the Export Clause of the Constitution, Art. I, § 9, cl. 5.

supports the trial court's rulings and also argues that the HMT is a user fee rather than a tax. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

■ We review the Court of International Trade's grant of summary judgment and conclusion of the constitutionality of the HMT *de novo. Princess,* 201 F.3d at 1357. We also review the interpretation of a statute, including questions of severability, *de novo. Id.*

## I

■ The trial court held that the import and domestic unloading portions of the HMT were severable from the unconstitutional export provision. *Thomson,* 219 F.Supp.2d at 1324 (citing *Amoco Oil,* 234 F.3d at 1377; *Princess,* 201 F.3d at 1358; *Carnival,* 200 F.3d at 1361). Thomson argues that the prior decisions holding the HMT severable "should not be treated as binding precedent" because: "The panel[s] in *Princess* [201 F.3d 1352] and *Carnival* [200 F.3d 1361] relied upon an observation that the World Trade Organization ('WTO') had not taken final action on whether the post-United States Shoe HMT on imports and not exports violated international agreements." Because the executive branch had already conceded in the WTO that there was a violation, Thomson argues, the basis for the panels' decisions was wrong. We disagree with Thomson and hold that our decisions in *Princess* and *Carnival* are binding precedent on this panel.

Contrary to Thomson's argument, our prior decisions did not turn on the WTO's position on the HMT as applied to imports. Those decisions relied, instead, on the presence of a severability clause in the WRDA (of which the HMT was a part) and the fact that "the legislative history of the statute does not show that Congress would not have imposed the [HMT] without applying it to exports." *Carnival,* 200 F.3d at 1366–67. Indeed, in dismissing the specific argument that Congress did not intend to make the application of the HMT to exports severable from the HMT as applied to imports because of possible conflicts, this court first noted that, in a different case, the Court of International Trade had found the legislative history on point " 'insufficient to rebut the strong presumption of severability.' " *Id.* at 1369 (citing *Amoco Oil Co. v. United States,* 63 F.Supp.2d 1332, 1337 (Ct. Int'l Trade 1999)). Further, the court noted that if the WTO were to take final formal action against the import portion of the HMT and "the result [were] to create serious problems, either the executive or the legislative branch presumably will take appropriate action." *Id.* This latter statement makes evident the court's view that subsequent action by the WTO is irrelevant to the question of whether Congress would have enacted only the import provision, because the action by the WTO could only take place after Congress enacted the provision. In short, we are bound by our precedent in *Carnival* to hold that the export provision of the HMT is severable from the remaining provisions of the statute.

## II

The trial court held that the HMT as to imports and domestic unloadings is a "tax" rather than a "user fee."[2] *Thomson,* 219 F.Supp.2d at 1325. The court applied the

**2.** This is a potentially dispositive point on the

Uniformity Clause issue because if the HMT is

three-prong test prescribed by the Supreme Court in *Massachusetts v. United States*, 435 U.S. 444, 464, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978): "(1) the charge must not discriminate against the constitutionally-protected interest; (2) the implementing authority must base the charge upon a fair approximation of the use of some system; and (3) the charge must be structured to produce revenue fairly apportioned to the total cost to the government of the benefits conferred." *Thomson*, 219 F.Supp.2d at 1325 (citing *Massachusetts*, 435 U.S. at 464, 98 S.Ct. 1153). The trial court held that the HMT, as applied to imports and domestic unloadings, failed the second and third prongs, relying entirely on the court's prior analysis of the HMT as applied to exports in *United States Shoe Corp. v. United States*, 907 F.Supp. 408 (Ct. Int'l Trade 1995), *aff'd*, 114 F.3d 1564, 1574 (Fed.Cir.1997), *aff'd*, 523 U.S. 360, 118 S.Ct. 1290, 140 L.Ed.2d 453 (1998). *Thomson*, 219 F.Supp.2d at 1325. In that case the trial court held that the HMT failed the second prong because low-value bulk importers use ports more, but pay less than high-value non-bulk importers and failed the third prong because the HMT is used to fund projects yet to be commenced, rather than repay the government for services rendered. *United States Shoe*, 907 F.Supp. at 415, 415 n. 2.

■■■ On appeal the government argues that the trial court's reliance on *United States Shoe* was misplaced, as the standard and the analysis involving the Export

Clause of the Constitution is far stricter than that involved in the Uniformity Clause.[3] Because of the different clauses at issue, and, consequently, the different standards applicable, the government argues that the HMT as applied to imports and domestic unloadings is a "user fee." We agree.

In *United States Shoe* this court applied the *Massachusetts* test to hold "that the HMT [as applied to exports] is not based on a fair approximation of use and, as such, is not a permissible user fee." *United States Shoe*, 114 F.3d at 1574. In doing so, this court distinguished *United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) (holding that a fee of 1.5% of all awards recovered from the Iran–United States Claims Tribunal was a valid user fee), based upon the fact that *Sperry* did not deal with a challenge under the Export Clause. *United States Shoe*, 114 F.3d at 1572–73. Indeed, this court specifically noted that the Supreme Court viewed the inquiry under the Export Clause as very strict. *Id.* at 1573 (citing *United States v. Int'l Bus. Mach. Corp.*, 517 U.S. 843, 851–52, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996) ("The text of the Export Clause, on the other hand, expressly prohibits Congress from laying any tax or duty on exports.")).

The importance of the strictness of the Export Clause inquiry was confirmed by the Supreme Court's affirmance in *United States Shoe*. In affirming that decision, the court noted "*IBM* plainly stated that the

---

held to be a user fee, the Uniformity Clause cannot apply, as it applies only to "duties, imposts, and excises." U.S. Const. Art. I, § 8, cl. 1.

**3.** Although the appellee in this appeal, the government is permitted to make this argument as an alternate basis for affirmance because the argument was raised below and is

supported by the record. *See Dandridge v. Williams*, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court.").

Export Clause's simple, direct, unqualified prohibition on any taxes or duties distinguishes it from other constitutional limitations on governmental taxing authority." *United States Shoe*, 523 U.S. at 368, 118 S.Ct. 1290. The Supreme Court distinguished three other Supreme Court cases upholding *ad valorem* charges as user fees solely because "[t]hose decisions involved constitutional provisions other than the Export Clause." *Id.* In addition, the Supreme Court did not even apply the *Massachusetts* test and instead relied on a different, more stringent standard specific to the Export Clause. *Id.* at 369–70, 118 S.Ct. 1290 (applying the test announced in *Pace v. Burgess*, 92 U.S. 372, 375–76, 23 L.Ed. 657 (1872)). In sum, the Supreme Court's opinion not only makes clear the importance of the strictness of the Export Clause to its decision, it implicitly rejects this court's analysis under the *Massachusetts* test.

Now we must analyze the HMT, as applied to imports and domestic shipping under the more flexible *Massachusetts* test. We first note that although many of the surface-level indicia[4] point to the HMT as being a tax, Congress seemingly intended the HMT to be a user fee. *United States Shoe*, 114 F.3d at 1578–80 (Mayer, J., dissenting) (citing and quoting multiple sources of legislative history, *e.g.*, S.Rep. No. 99–126, at 7 (1985), *reprinted in* 1986 U.S.C.C.A.N. 6639, 6644 ("The taxes and fees in this legislation are not for the purpose of raising revenue. Rather, they are to repay costs related directly to the servicing of commerce. These fees and taxes offset services rendered to vessels.")).

The first prong of the *Massachusetts* test asks whether the charge unfairly discriminates against the constitutionally-protected interest implicated by the charge. 435 U.S. at 464, 98 S.Ct. 1153. Neither appellant makes any argument under this prong, but we address it briefly. In this case, the only possible constitutional interests implicated are those embodied in the Uniformity and Port Preference Clauses. The charge itself, however, implicates neither—it is only the exemptions in the HMT that possibly implicate either clause. That being the case, we do not see how the charge could be viewed as discriminating against any constitutionally-protected interest associated with either clause.

The second prong asks whether the charge is a fair approximation of the importers' and domestic shippers' use of United States harbors and ports. *Id.* Appellants argue that the HMT as applied to imports and domestic unloadings "does not correlate reliably with the federal harbor services used or usable." *United States Shoe*, 523 U.S. at 369, 118 S.Ct. 1290. Appellants point us to the arguments embraced by this court in *United States Shoe*, where the appellant in that case argued:

> [T]he amount of the HMT has no relationship to the size or weight of the vessel or the necessary depth of the port required by the vessel.... [E]ven though the bulk cargo exporters generally require a larger vessel and a deeper port, and therefore "use" the port to a greater extent, they pay a lower tax than high value, low bulk cargo exporters. Moreover, a ship that docks but does not load or unload cargo is not required to pay a fee,

**4.** The HMT is codified in the Internal Revenue Code and refers to itself as a tax both in

its title and in its body.

even though that ship otherwise utilizes the port. Additionally, there is apparently no correlation between the amount of fees collected at a particular port and the expenditure of funds from the Trust Fund to maintain that particular port.... Finally, it is not consistent with a true user fee that so many users are exempted, such as those carrying bunker fuel, ship's stores, equipment necessary for the operation of the vessel and fish and other aquatic animal life not previously landed on shore, since ships carrying these products use the port facilities to the same extent as ships carrying products subject to the HMT.

114 F.3d at 1572 (citations omitted). As noted above, because the cases show that *ad valorem* charges are generally upheld in contexts outside of the Export Clause and because this court's prior analysis depended upon the strictness of the inquiry in the Export Clause context, we disagree with appellants, and hold that the HMT as applied to imports and domestic unloadings is a fair approximation of the use of the ports.

To satisfy the second prong of the *Massachusetts* test, a user fee must only "reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 717, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972). User fees need not "be precisely calibrated to the use that a party makes of government services." *Sperry*, 493 U.S. at 60, 110 S.Ct. 387. Indeed, "when the Federal Government applies user charges to a large number of parties, it probably will charge a user more or less than it would under a perfect user-fee system." *Id.* at 61, 110 S.Ct. 387.

Nonetheless, the Supreme Court has "declined to impose a requirement that the Government 'give weight to every factor affecting appropriate compensation for [the corresponding use].'" *Id.* (quoting *Massachusetts*, 435 U.S. at 468 n. 8, 98 S.Ct. 1153). In addition, the Supreme Court has considered the administrative costs associated with a corresponding increase in the closeness of the approximation of use. *Massachusetts*, 435 U.S. at 466, 98 S.Ct. 1153; *Capitol Greyhound Lines v. Brice*, 339 U.S. 542, 546–47, 70 S.Ct. 806, 94 L.Ed. 1053 (1950) ("Each additional factor adds to administrative burdens of enforcement.... We have recognized that such burdens may be sufficient to justify ... ignoring [key factors], although the result may be a tax which on its face appears to bear with unequal weight upon different carriers." (citations omitted)).

Applying those standards, we hold that the HMT's *ad valorem* charge is based upon a fair approximation of the cost of the benefits provided for port users. Although imperfect in its application, Congress rationally determined that value was "the only acceptable basis on which to impose such charges. This national uniform basis minimizes any possible disadvantages among cargo types and U.S. ports which otherwise might result from user charges." H.R.Rep. No. 99–228, at 5–6, *reprinted in* 1986 U.S.C.C.A.N. at 6710. Congress carefully considered the basis for the charge, hearing much testimony in favor of an *ad valorem* charge over a port-specific fee or a flat tonnage fee. *See, e.g.*, Senate Comm. on Finance, Hearings 99–410, 99th Cong., 1st Sess. 47 (Sept. 10, 1985); House Comm. on Ways and Means, Hearing 99–36, 99th Cong., 1st Sess. 59 (Sept. 5, 1985). Congress also viewed the *ad valorem* basis as one that

would minimize administrative costs associated with collection. *See* H.R.Rep. No. 99–228, at 10, *reprinted in* 1986 U.S.C.C.A.N. 6705, 6714. Further, the imperfections urged to be fatal here are no more severe than those attached to other charges that the Supreme Court has upheld in other cases. *Sperry*, 493 U.S. at 59–64, 110 S.Ct. 387 (upholding as a user fee a charge of 1.5% of awards recovered from the Iran–United States Claims Tribunal); *Massachusetts*, 435 U.S. at 467–70, 98 S.Ct. 1153 (upholding as a user fee an annual fee (varying depending on type and weight of the aircraft) on all civil aircraft that fly in the navigable U.S. airspace even though "not all aircraft make equal use of the federal navigational facilities or of the airports"); *Evansville*, 405 U.S. at 717–20, 92 S.Ct. 1349 (upholding a user fee of one dollar per commercial airline passenger to pay for airport construction and maintenance even though the "measures exempt[ed] in whole or part a majority of the actual number of persons who use facilities of the airports involved" because those exemptions were not "wholly unreasonable"); *Greyhound Lines*, 339 U.S. at 545, 70 S.Ct. 806 (upholding as a user fee a highway tax of "2% upon the fair market value of motor vehicles used in interstate commerce"); *see also Alamo Rent–A–Car, Inc. v. City of Palm Springs*, 955 F.2d 30, 30–31 (9th Cir.1992) (upholding as a user fee a charge of 7% of a car rental company's gross receipts from car rental customers it picked up at an airport); *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Auth.*, 906 F.2d 516, 518–21 (11th Cir.1990) (upholding as a user fee a charge of 10% of a car rental company's gross receipts from car rental customers it picked up at an airport).

Turning now to the third prong, we hold that the HMT is not excessive in relation to the expenditures by the government. *See Massachusetts*, 435 U.S. at 444, 98 S.Ct. 1153. The trial court held that this prong was not met solely because the HMT is used to fund future projects and not to repay the government for services rendered. *Thomson*, 219 F.Supp.2d at 1325. This failing, however, is not fatal to the HMT's status as a user fee. The HMT's (and the corresponding trust fund's) purpose is to provide for the operation and maintenance of channels and harbors. This is certainly a long-term project and must have been viewed as such. Given the nature of the problem the HMT addresses, it seems inconsequential and indeed unavoidable that the HMT pays for future programs. *Alamo*, 906 F.2d at 522 ("[G]iven the long term nature of maintaining and developing an airport, it was appropriate ... to factor in future development plans when setting user fees."); *see also Massachusetts*, 435 U.S. at 470 n. 25, 98 S.Ct. 1153 ("[A] surplus of revenue over outlays in any one year can be offset against actual deficits in past years and perhaps against projected deficits of future years."). Further, no HMT funds can be used for any purpose other than the operation and maintenance of channels and harbors (or related costs), meaning the funds will always be used to continue the benefits of the services previously provided. 26 U.S.C. § 9505. Indeed, in upholding other charges as user fees, the Supreme Court has noted that the fees were deposited in a dedicated trust fund to cover only the expense of government facilities or services. *See, e.g., Morgan's La. & T.R. & S.S. Co. v. Bd. of Health*, 118 U.S. 455, 461, 6 S.Ct. 1114, 30 L.Ed. 237 (1886); *Head Money Cases*, 112 U.S. 580, 596, 5 S.Ct. 247, 28 L.Ed. 798 (1884).

In sum, because the HMT as applied to imports and domestic unloadings is a valid

user fee and not a tax, we hold that it is outside the scope of the Uniformity Clause's prohibitions.

## III

The trial court held that the Port Preference Clause prohibits only deliberate discrimination against the ports in one or more states and in favor of others. *Thomson*, 219 F.Supp.2d. at 1330–31. Appellants argue the trial court erred in its interpretation, and that the Clause prohibits any positive legislation intended to produce a direct privilege or preference favoring the ports of any particular state over those of another. That is the case here, appellants argue, because the HMT gives preference to the ports of Alaska and Hawaii by exempting domestic unloadings in those two states from HMT liability.[5] We disagree and hold that the trial court properly interpreted and applied the Port Preference Clause.

■ The Port Preference Clause reads: "No preference shall be given by any regulation of Commerce or Revenue to the Ports of one State over those of another." U.S. Const. Art. I, § 9, cl. 6. The Clause was proposed by Maryland's delegate to the Constitutional Convention, Luther Martin, who worried that Congress "might favor the ports of particular States, by requiring vessels to or from other States to enter & clear thereat, as vessels belonging or bound to Baltimore, to enter & clear at Norfolk." 2 Max Farrand, *The Records of the Federal Convention of 1787*, 417 (1966). Martin later opposed the Clause because it dealt only with express preferences and left states to bear the effects of other rules. Luther Martin, *Genuine Information* (1788), *reprinted in* Philip B. Kurland & Ralph Lerner, 3 *The Founders' Constitution* 372 (1987). In interpreting the clause, the Supreme Court has stated, "what is forbidden is not discrimination between individual ports within the same or different states, but discrimination between states." *Penn. v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 435, 18 How. 421, 15 L.Ed. 435 (1855). That decision and other decisions interpreting the Clause make clear only that the Clause does not prohibit a facially nondiscriminatory law that has incidental, disparate effects on ports of one or more states. *E.g.*, *Wheeling*, 18(How.) 421, 59 U.S. at 433–36; *Armour Packing Co. v. United States*, 209 U.S. 56, 80, 28 S.Ct. 428, 52 L.Ed. 681 (1908); *La. Pub. Serv. Comm'n v. Tex. & New Orleans R.R.*, 284 U.S. 125, 131, 52 S.Ct. 74, 76 L.Ed. 201 (1931); *City of Houston v. Fed. Aviation Admin.*, 679 F.2d 1184, 1197–98 (5th Cir.1982); *City of Milwaukee v. Yeutter*, 877 F.2d 540, 546–47 (7th Cir.1989).

Appellants argue from this case law that the Clause prohibits all express preferences for the ports of one state over the ports of another. Their logic is flawed. The above-cited decisions support only the proposition that a facially nondiscriminatory statute that causes disparate effects does not violate the Clause. This is simply not an issue in this case. The cases do not support the proposition that a statute with explicit exemptions of states to *prevent*

---

**5.** In its briefing Thomson argues the Port Preference Clause is violated by the exemptions of a 47.5 mile segment of the Columbia River and inland waterways. However, as neither of those exemptions gives express preference to the ports of one state over another, we reject those arguments out of hand. *See Penn. v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 435, 18 How. 421, 15 L.Ed. 435 (1856). Appellants make no argument addressing the exemption for ports in the United States' possessions.

disparate effects violates the Clause. These are two entirely different issues.

■ We are directed to no case holding directly supporting the trial court's interpretation of the clause either. One somewhat instructive statement, however, comes from the United States Court of Appeals for the Fifth Circuit:

> Government actions do not violate the Clause even if they result in some detriment to the port of a state, where they occur (i) as an incident to some otherwise legitimate government act regulating commerce or (ii) more *as a result of the accident of geography* than from an intentional government preference.

*Houston,* 679 F.2d at 1197 (emphasis added). Although the holding in *Houston* does not address the issue in this appeal, we see a strong implication, particularly from prong (ii) of the announced test, that geography can play a role so long as it is not indicative of an intentional preference. In addition, a recent statement by Justice Thomas offers some support, although it is quite clearly not a holding of the Supreme Court. *United States v. Lopez,* 514 U.S. 549, 587, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Thomas, J., concurring) ("Although it is possible to conceive of regulations of manufacturing or farming that prefer one port over another, the more natural reading is that the [Port Preference] Clause prohibits Congress from using its commerce power to channel commerce through certain favored ports."). The statement of the Fifth Circuit and Justice Thomas's views comport with the historic purpose for including the clause in the Constitution: "[It] gave small states [e.g., Maryland] protection against deliberate discrimination against them by other, more powerful states [e.g., Virginia]." *Houston,* 679 F.2d at 1198. Therefore, we

hold that the better view of the Port Preference Clause is that it prohibits only intentional, effectual preference of the ports of one state over ports of another state, advantaging certain states' ports by disadvantaging other states' ports.

■ That being the case, we hold that the exemptions at issue here are not the sort of preference prohibited by the Clause. Instead, Congress crafted a narrow exemption to alleviate a disproportionate incidence of the tax on Alaska and Hawaii as a result of their heavy reliance on domestic shipping. As a starting point, we note that there was ample evidence in the legislative history supporting Congress' view that the vast geographical separation of the exempted states from the "lower forty-eight states" was a complication that made Alaska and Hawaii heavily dependent on domestic shipping (as opposed to other forms of transportation of goods). *E.g., Water Resources Conservation, Development, and Infrastructure Improvement Act of 1985: Hearing on H.R. 6 Before the House Committee on Ways and Means,* 99th Cong. 30 (1985) ("Virtually everything in and out of [Hawaii] must travel by ship.... A port user fee, therefore, would be levied on over 80% of all the states goods and materials."); 132 Cong. Rec. S2739–02, S2825 (daily ed. Mar. 14, 1986) ("Surface transportation in Alaska is almost exclusively waterborne. For much of Alaska waterborne shipping is the only way to get materials to communities where they will be used."). To solve this problem, the exemption then, only applies to domestic unloadings, not imports or exports. 26 U.S.C. § 4462(b). Thus, no advantage arises for international shipping to and from ports of these states, because there is no indication that Alaska and Hawaii are more dependent on international shipping than any other states. In addi-

tion, the exemption also applies to "possessions" of the United States, *id.*, such as Puerto Rico or Guam which are also geographically isolated, confirming that the exemption was designed to minimize disadvantages inherent in applying the HMT to domestic cargo of distant ports because of their geographic isolation—namely greatly increased dependence of those entities on domestic shipping. Lastly, the exemption also applies to ports receiving shipments from Alaska and Hawaii, meaning that there are exempted unloadings (potentially) in the ports of all states. *Id.* In short, it is clear that the intent and effect of the exemption was not to provide a preference to the ports of the exempted states at the expense of the ports of other states, but rather to provide some relief from the disparate effects the HMT would have had on the shipping-dependent states and possessions.

Second, and apart from our determination that Congress did not intend an illicit preference to be given to Alaska or Hawaii, we find it difficult to discern an actual preference for those ports. It is true that domestic shipments—except for crude oil shipments out of Alaska—that arrive in the ports of those states will not be subject to HMT liability. *Id.* It is also true that the ports of both states are geographically isolated and as such are more heavily dependent on domestic shipping to receive goods. This isolation, however, also makes it difficult to imagine domestic shippers deliberately routing cargo to a port in Alaska or Hawaii as an intermediate stop (say, on a shipment from Long Beach to Seattle) in order to avoid HMT liability. In that respect, it is hard to view this exemption as one that will channel commerce through the ports of one state to the detriment of the ports in other states. In addition, the express exemption also applies to domestic cargo shipped from ports in Alaska and Hawaii and therefore exempts certain domestic unloadings in ports of other states from liability. Thus, the exemption applies not only in the ports of Alaska and Hawaii, but also in the ports of any state that receives shipments from the ports of Alaska or Hawaii. In those circumstances, the ports of other states are given the same advantage (no HMT liability) as the ports in Alaska or Hawaii.

Lastly, we note that the exemptions were expressed using two states' names does not in itself indicate that Congress intended or effected a preference to the ports of those states. Congress merely used the convenience of naming those states, rather than devising a formulation that would somehow include all states and possessions within a certain class—i.e., those that are geographically distant from the lower forty-eight states and that lack a plausible alternative to ocean shipping. In essence, naming the states and possessions as exempted merely served as a proxy for a complex formula defining excessive isolation causing a greater dependency on domestic cargo than that experienced by other coastal states.

In sum, we conclude that the exemption of HMT liability for domestic unloadings at the ports in Alaska and Hawaii (and U.S. possessions) and at any other port in the U.S. when the shipment is from a port in Alaska and Hawaii (or U.S. possession), does not give a preference to the ports of Alaska and Hawaii that violates the prohibition of the Port Preference Clause.

## CONCLUSION

In conclusion, we affirm the trial court's decisions in both appeals because we hold that the HMT as applied to imports and

domestic unloadings is not a tax but a user fee making the Uniformity Clause inapplicable, and because we hold that the various exemptions in the HMT do not violate the Port Preference Clause of the Constitution.

*AFFIRMED.*